**Earl SMITH, Jr., Appellant,**

v.

**SECRETARY OF the NAVY.**

**No. 79–1877.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1980.

Decided Jan. 30, 1981.

---

Frances B. Aubrey, Washington, D. C., for appellant.

Christopher A. Myers, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and Michael W. Farrell and Robert E. L. Eaton, Jr., Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before McGOWAN, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Dissenting opinion filed by Circuit Judge MacKINNON.

J. SKELLY WRIGHT, Circuit Judge:

Although much of the argument in this court focused on whether the plaintiff-appellant in this case was a "prevailing party" entitled to consideration for attorney's fees,[1] resolution of that issue ultimately depends on a deeper question: whether Title VII[2] creates a cause of action for a person who is the victim of a discriminatory job-performance evaluation, but who cannot demonstrate that the evaluation constituted the cause of his being denied a specific job or promotion. We hold that Title VII does provide a cause of action in this case, and that a plaintiff who is the subject of illegal evaluations is entitled, at a minimum, to have any discriminatory records purged from his personnel files. We hold, further, that a plaintiff who wins such relief is a "prevailing party" eligible for attorney's fees under the statute. Because

---

1. *See* 42 U.S.C. § 2000e–5(k) (1976):

   In any action or proceeding under this chapter the court, in its discretion, may allow the prevailing party * * * a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

2. Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.* (1976).

the District Court held otherwise,[3] its decision must be reversed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts*

The appellant in this case, Earl Smith, Jr., is a black male employed as an Electronics Engineer, GS–13, at the Naval Electronics Systems Command (NAVELEX).[4] Smith joined the Department of the Navy as an engineer in 1967. In 1973 he was also designated by the Department as an Equal Employment Opportunity (EEO) counselor,[5] a capacity in which he served until 1977. Since January 1975 Smith's primary supervisor, responsible for evaluating his engineering but not his EEO work, has been Mr. George Bednar, who is white.[6]

In the fall of 1975 appellant Smith applied for two jobs that would have constituted promotions. In September he applied for the vacant position of Production Administrator at the Naval Sea Systems Command (NAVSEA), Department of the Navy.[7] Shortly thereafter he sought the vacant job of Assistant Data Systems Electronics Engineer with the National Aeronautics and Space Administration (NASA).[8] George Bednar gave supervisory appraisals of Smith's work in connection with Smith's applications for both jobs. Smith got neither. In both cases the ratings given him by Bednar were too low for Smith to rank among the most qualified candidates.

In conjunction with Smith's candidacy for the NAVSEA vacancy, Bednar completed a qualifications inquiry or employee appraisal form.[9] Bednar rated Smith "average" in 12 categories and stated that he had no basis for rating appellant in three others. Bednar categorized Smith as "below average" in keeping abreast of new developments in his field, in effectiveness in presenting ideas, and in "self-reliance." In a space provided for additional information, Bednar wrote that "Mr. Smith lets other non work functions take to [*sic*] much of his time and the work suffers—therefore self reliance was scored low."[10] A copy of the NAVSEA evaluation form was apparently entered in appellant's personnel file at NAVELEX.[11]

Smith's application to NASA also triggered a request for a supervisory evaluation, to which Bednar again responded. Speaking over the telephone, Bednar rated appellant as "average" in 17 of 23 categories, "above average" in two, and "less than average" in four.[12] Bednar was also recorded as describing appellant as having "no potential for promotion at NAVELEX."[13] NASA again contacted Bednar by telephone on a second occasion, but this time Bednar refused to offer an oral evaluation.[14]

Some time after he had filed his NAVSEA application, Smith visited the NAVSEA personnel specialist to inquire about his prospects. During the course of the conversation, Smith was allowed to see his supervisor's appraisal.[15] Upset by what

---

3. The memorandum opinion of the District Court ("Memorandum Opinion"), filed April 6, 1979, is reprinted at Joint Appendix (JA) 19a–28a.

4. Memorandum Opinion at 1, JA 19a.

5. Brief for appellee at 4–5.

6. Memorandum Opinion at 1, JA 19a.

7. Memorandum Opinion at 2, JA 20a.

8. *Id.*

9. *Id.*

10. *Id.*

11. The Secretary of the Navy ordered removal from appellant's personnel files of performance appraisals issued in conjunction with his applications. *See* Letter from Secretary of the Navy to Earl Smith, Jr. ("Secretary's Decision") (April 10, 1979) at 2.

12. Memorandum Opinion at 2, JA 20a.

13. *Id.*

14. *Id.*

15. Memorandum Opinion at 2–3, JA 20a–21a.

he saw, Smith confronted Bednar, who, Smith testified, told him that the critical reference to "non work functions" was based on Smith's devotion of time and energy to his EEO duties.[16]

Smith similarly telephoned the personnel specialist at NASA to attempt to ascertain his rating there. He was advised that he was not in the "highly qualified" group because of his supervisor's appraisal.[17] Smith did not discuss his NASA appraisal with Bednar.

Smith once again became the subject of an evaluation by Bednar when the latter completed a performance rating for the period January 1975 to January 1976.[18] Although Smith was rated as "fully satisfactory" in most categories, he received no "outstanding" ranks from Bednar. By contrast, Smith's EEO supervisor classified him as "outstanding" in both counselling and complaints negotiations.[19]

### B. *Administrative Action*

Smith responded to the sequence of supervisory appraisals by filing two informal complaints in which he alleged that Bednar's evaluations reflected racial discrimination and illegal reprisal for his EEO counselling.[20] He subsequently filed two formal complaints at the administrative level. In the first, dated April 14, 1976, Smith alleged illegal reprisal and racial discrimination with respect to the supervisory rating accompanying his NAVSEA application.[21] The second, filed July 2, 1976, made similar allegations concerning his NASA application.[22] After investigating the com-

plaints the defendant agency issued two proposed dispositions, both of which appellant found unacceptable. He therefore requested hearings before a Civil Service Complaints Examiner, who consolidated the complaints and convened a joint hearing on February 10, 1978.[23]

At the conclusion of the hearing, the Examiner recommended a finding of reprisal with respect to the NAVSEA supervisory ratings.[24] He based this recommendation on the conclusion that Bednar had penalized Smith for his work as an EEO counselor:

> Mr. Bednar's appraisal resulted from his frustration and resentment at the loss of control he had over complainant during the time he spent performing EEO duties and * * * but for the resentment complainant would have received a somewhat better appraisal.[25]

The Examiner's report adduced no evidence to support Bednar's assertion that Smith had devoted "to [sic] much of his time" to EEO matters or otherwise permitted his EEO functions to distract him improperly from his engineering work. On the contrary, the Secretary of the Navy later described the Examiner's investigation as having revealed that Bednar "was not familiar with the duties and responsibilities of an Equal Employment Opportunity Counselor,"[26] that Smith's job description should be "amended to include Equal Employment Opportunity Counselor duties of 25%, with position descriptions of other counselors amended accordingly,"[27] and that Bednar should be scheduled for EEO training classes.[28] Without assigning any fault to Smith,[29] the Examiner found that Bednar's

---

16. Memorandum Opinion at 3, JA 21a.

17. Trial Transcript (Tr.) 41–43, JA 55a–57a.

18. Brief for appellee at 7.

19. Tr. 49–52, JA 58a–61a.

20. Memorandum Opinion at 6, JA 24a.

21. *Id.*

22. *Id.*

23. *Id.*

24. The Findings and Recommended Decision in the Discrimination Complaint of: Earl Smith, Jr. ("Examiner's Findings") (March 23, 1978).

25. *Id.* at 3.

26. Secretary's Decision, *supra* note 11, at 2.

27. *Id.*

28. *Id.*

29. The view that any fault should be assigned to Bednar rather than to Smith is corroborated by the testimony of Mr. Leonard Vann, Deputy

critical appraisal "resulted from *improper* consideration of [Smith's] EEO duties." [30] The Examiner stated plainly that the critical NAVSEA rating occurred, not because Smith was black, but because of his participation in the EEO program. [31]

Concerning Smith's NASA complaint, the Examiner found neither racial discrimination nor illegal reprisal. [32] In the NASA case, in which there was no specific criticism of Smith for devoting too much time to EEO functions, the Examiner apparently credited Bednar's testimony to the effect that Smith "was considerably behind schedule in completing his assignments and that even when his EEO duties are taken into consideration complainant did not perform as well as could be expected." [33]

At the conclusion of his report the Complaints Examiner reached the question of corrective action for the wrongful and punitive NAVSEA evaluation. Finding that Smith would not have received the NAVSEA position even if more favorably evaluated, the Examiner recommended against awarding the priority consideration for promotion that Smith had requested. [34] However, consistent with his finding that the NAVSEA evaluation reflected "improper consideration" of Smith's devotion of time to EEO functions, the Examiner determined that the offending assessment should be "removed from any official personnel records and destroyed." [35]

In the final administrative decision in the case, issued on April 10, 1978, the Secretary of the Navy concurred in the findings, decision, and corrective action recommended by the Complaints Examiner. [36] The Secretary declined, however, to award Smith attorney's fees as the prevailing party in a Title VII action.

### C. Proceedings in the District Court

Dissatisfied with the administrative resolution, including the denial of attorney's fees, appellant brought suit in the District Court. [37] Once again he alleged reprisal and discrimination in connection with both his NAVSEA and his NASA applications. He also presented a claim that he was denied training courses because of his race and because of his involvement with the EEO program.

At the conclusion of a trial *de novo* the District Court found as a fact that Smith had not been denied training courses because of either racial discrimination or illegal reprisal. [38] The court also held that Smith's complaint regarding his NAVSEA and NASA applications had failed to state even a *prima facie* case of employment discrimination cognizable under Title VII. [39] It reached this conclusion by applying the four-part test elaborated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Under that standard a plaintiff establishes a *prima facie* case of employment discrimination by showing

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek

---

EEO Officer for NAVELEX, who concluded that Bednar's improperly critical assessment of Smith constituted a violation of Bednar's own EEO obligations. As a result of his personal inquiry, Vann suggested, and even composed, a letter of caution to Bednar warning him that his actions were improper. At the direction of some higher level official, the letter was not issued. *See* Examiner's Findings, *supra* note 24, at 2.

**30.** *Id.* at 4 (emphasis added).

**31.** *See id.*

**32.** *Id.*

**33.** *Id.* at 2.

**34.** *Id.* at 4.

**35.** *Id.*

**36.** Secretary's Decision, *supra* note 11.

**37.** His complaint, filed May 25, 1978, is reprinted at JA 3a–8a.

**38.** Memorandum Opinion at 7–8, JA 25a–26a.

**39.** *Id.*

applicants from persons of complainant's qualifications. * * *

Adapting the *McDonnell Douglas* test to the facts of this case, the District Court held that "plaintiff has failed to establish a prima facie case of race discrimination, for the record indicates that even if his supervisory appraisals were free from any improper consideration of his EEO activities, plaintiff would not have been among the best qualified for the positions sought."[40] In concluding that Smith was not among the most qualified applicants, the District Court accepted the administrative determination that Smith was only "an average employee whose qualifications did not meet those required for the positions he sought."[41] The court further determined that NAVSEA was under a hiring and promotion freeze at the time of appellant's application,[42] and that it could therefore not have awarded the position to Smith, who was an outside applicant, even had Smith been rated higher.[43] The court also found that appellant was less qualified than the NASA selectee in terms of experience[44]; even if ranked one letter grade higher in each evaluative category in the supervisor's appraisal, he would not have scored as high as the top-ranked candidates.

Despite its finding that appellant failed to establish a *prima facie* case, the District Court seems to have accepted the decision of the Secretary that appellant's supervisor had, in the context of his NAVSEA application, issued an evaluation constituting improper reprisal for Smith's EEO activities.[45] The court therefore concurred that "destruction of the appraisals is the appropriate remedy[.]"[46] But it declined to award Smith the attorney's fees routinely granted to "prevailing parties" in Title VII litigation.[47] Although its opinion is not entirely

free from ambiguity on this point, the District Court apparently concluded that appellant could not be considered a prevailing party because he had failed to state even a *prima facie* case of employment discrimination under the four-part test of *McDonnell Douglas*. This appeal ensued.

## II. ELEMENTS OF THE PRIMA FACIE CASE UNDER TITLE VII

We do not understand appellant to contend in this appeal that he asserted a *prima facie* case of employment discrimination under the *McDonnell Douglas* standard. Rather, appellant argues that he stated a cause of action for unlawful reprisal, cognizable under a different standard, on which he was entitled to a decision, and to some form of relief, from the District Court.[48] We believe that appellant did state a cause of action under Title VII, the validity of which was implicitly recognized by both the administrative agency and the District Court in their conclusions that Smith was entitled to the "remedy" of having any legally wrongful records destroyed. Accordingly, we conclude that Smith must be considered a "prevailing party" eligible for attorney's fees under the statute. As we shall explain, we believe that this decision is mandated by the plain language of Title VII and that it is fully consistent with the Supreme Court decision in *McDonnell Douglas*.

### A. *The Limits of* McDonnell Douglas

The District Court apparently interpreted the Supreme Court's decision in *McDonnell Douglas* as stating necessary conditions for establishment of a *prima facie* case of employment discrimination under Title VII. The court seems to have accepted the con-

---

**40.** Memorandum Opinion at 7, JA 25a.

**41.** Memorandum Opinion at 8, JA 26a.

**42.** Memorandum Opinion at 7, JA 25a.

**43.** *Id.*

**44.** Memorandum Opinion at 8, JA 26a.

**45.** *See* Memorandum Opinion at 9, JA 27a ("The sole finding in favor of plaintiff was that

his supervisory evaluation reflected an improper consideration of his EEO duties.").

**46.** Memorandum Opinion at 8, JA 26a.

**47.** Memorandum Opinion at 9, JA 27a.

**48.** *See* brief for appellant at 1–2.

clusion that appellant's supervisor, Bednar, had issued reports "reflect[ing] an improper consideration of appellant's EEO duties." [49] Nonetheless, while recognizing the wrong, for which "destruction of the appraisals [was] the appropriate remedy," [50] the court considered itself bound to hold that not even a *prima facie* case had been stated under Title VII, because "the record indicates that even if his supervisory appraisals were free from improper consideration of his EEO activities, plaintiff would not have been among the best qualified for the positions sought." [51]

We believe the District Court misconstrued *McDonnell Douglas*. Read in isolation certain portions of that decision might suggest that the Supreme Court intended to establish uniform guidelines for pleading and proof in Title VII cases. But the Court stated explicitly that "the specification above of the prima facie proof required from respondent is not necessarily applica- ble in every respect to differing factual situations." [52] A plaintiff, it said, "may" establish a *prima facie* case [53] by citing the four *McDonnell Douglas* factors. But the Court made clear that a plaintiff would not be required to do so in all cases. [54] We find this to be a case in which the *McDonnell Douglas* test would not be appropriate.

The *McDonnell Douglas* standard links the questions of statutory wrong and statutory remedy. [55] To state a *prima facie* case under *McDonnell Douglas*, a plaintiff must make a showing that he would have got a job or promotion "but for" an illegal act of discrimination. If he does so, he shifts to the employer the burden, not only of articulating a defense against the charge of discriminatory treatment, but of rebutting the *prima facie* case of entitlement to one or more of a particular set of remedies—back pay, reinstatement, or preferential hiring or promotion. [56] The linkage of the questions

---

**49.** Memorandum Opinion at 8, JA 26a.

**50.** *Id.*

**51.** Memorandum Opinion at 7, JA 25a.

**52.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13, 93 S.Ct. 1817, 1824 n.13, 36 L.Ed.2d 668 (1973).

**53.** *Id.* at 802, 93 S.Ct. 1824.

**54.** The Court made this point explicitly when called upon to construe *McDonnell Douglas* in the later case of *International Brhd of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977):

> The company and union seize upon the *McDonnell Douglas* pattern as the *only* means of establishing a prima facie case of individual discrimination. Our decision in that case, however, did not purport to create an inflexible formulation. We expressly noted that "[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [a plaintiff] is not necessarily applicable in every respect to differing factual situations." * *

(Emphasis and first ellipsis in original; citation omitted.)

**55.** The case involved a claim that the employer, McDonnell Douglas, had failed to rehire a previously laid-off employee because of both his race and his various efforts to combat racial discrimination by the employer. The Court, like the parties, appeared to assume without question that, if the plaintiff prevailed on the merits, then judicially mandated rehiring would form at least part of the remedy. *See* 411 U.S. at 803, 804, 807, 93 S.Ct. at 1824, 1825, 1826.

**56.** The association in *McDonnell Douglas* of the "but for" test with specific remedies accords with the language of Title VII. The statutory provision specifically providing for the remedies of back pay, reinstatement, and preferential hiring and promotion, 42 U.S.C. § 2000e–5(g) (1976), unmistakably rings in "but for" terms:

> No order of the court shall require * * * the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual * * * was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

By contrast, the statutory prohibition of discriminatory employment speaks unconditionally, without limitation to acts causing particular harms such as the loss of a particular job or promotion. 42 U.S.C. § 2000e–3(a) (1976) provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assist-

of legal wrong and legal remedy is entirely appropriate in view of the facts of *McDonnell Douglas* and of similar cases—typically cases in which a plaintiff claims that he was rejected for an employment vacancy on grounds of race or reprisal, that the harm he suffered was denial of the particular job sought, and that the appropriate remedy is back pay plus preferential hiring or promotion.

It is obvious, however, that a plaintiff may suffer harms from discrimination that fall short of demonstrable loss of a job or a promotion. An unfavorable employee assessment, placed in a personnel file to be reviewed in connection with future decisions concerning pay and promotion, could both prejudice the employee's superiors and

materially diminish his chances for advancement.[57]

Despite the linkage established in *McDonnell Douglas*, this court has recognized that the questions of statutory violation and appropriate statutory remedy are conceptually distinct. *See Day v. Mathews*, 530 F.2d 1083, 1084–1085 (D.C.Cir.1976) (*per curiam*). An illegal act of discrimination— whether based on race or some other factor such as a motive of reprisal—is a wrong in itself under Title VII, regardless of whether that wrong would warrant an award of back pay or preferential hiring.[58] The goal of the statute is to bar all employer actions based on impermissible factors. In a case such as this the question must therefore be whether appellant has suffered an act of

---

ed, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

**57.** In applying the *McDonnell Douglas* test for the assertion of a *prima facie* case, the District Court might possibly have believed that a plaintiff's "standing" to bring a Title VII action requires injury in the form of a denial of a job or promotion caused by the defendant's discriminatory acts. The statute provides no basis for such a conclusion. Title VII provides for the filing of administrative charges and subsequent filing of civil actions by "persons aggrieved." 42 U.S.C. § 2000e–5(b), (f) (1976). In determining who is an "aggrieved party" under the statute, reference must be made to "the standing concepts articulated by the Supreme Court as 'injury in fact' and an interest 'within the zone of those regulated by the statute or constitutional guarantee in question.' " *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1341 n.4 (D.C.Cir.1973) (*quoting Ass'n of Data Processing Organizations v. Camp*, 397 U.S. 150, 152–153, 90 S.Ct. 827, 829–830, 25 L.Ed.2d 184 (1970)). On the facts of this case, there can be no doubt that appellant satisfies the requirements of both "concepts." Where the plaintiff is a victim of prohibited discrimination by an employer subject to the Act, he plainly falls within the zone of protected interests. Moreover, the location of an unfavorable evaluation in appellant's personnel files, presently injuring his reputation and threatening him with denial of future benefits rightfully due him, plainly enabled him to satisfy both the constitutional and the statutory requirements of injury-in-fact. *See Menard v. Saxbe*, 498 F.2d 1017, 1023 (D.C.Cir.1974) (FBI maintenance and dissemination of criminal file create presently cognizable legal injury to plaintiff); *Sullivan v. Murphy*, 478 F.2d 938, 962 (D.C.Cir.

1973) (unlawful maintenance of records of arrest results in injuries and dangers and the "threat is not dissipated, or rendered insubstantial or illusory, by the fact that the arrest was not followed by a prosecution") (footnote omitted).

**58.** *See Day v. Mathews*, 530 F.2d 1083, 1084–1085 (D.C.Cir.1976) (*per curiam*). The District Court in *Day* had determined that the plaintiff was the victim of racially discriminatory treatment in his application for promotion and, rejecting the "but for" test, had ordered retroactive promotion and back pay. *See id.* at 1084. After hearing the case on appeal, this court remanded for further proceedings concerning remedy only. *Id.* at 1086. Although the question of alternative remedies was not reached, because the defendant *conceded* the plaintiff's entitlement to a remedy in the form of priority consideration for the promotion he had been denied and had actually awarded such a promotion after the plaintiff commenced the litigation, *see id.* at 1084–1085 n.1, the court's statement of the issues reflects a clear distinction between the question of legal wrong and appropriate legal remedy:

Discrimination is of course a serious matter wherever it appears, and the supervising officials should take action to root it out, *whether or not the applicant in a particular case would have been hired or promoted* absent the discrimination. But when retroactive promotion and back pay are sought, *further questions* must be answered. * * * Unless the court finds that Day would otherwise have been promoted, back pay is inappropriate.

*Id.* at 1084–1085 (emphasis added; footnotes omitted).

discrimination made unlawful under Title VII.

## B. Statutory Protections

The decision of this court in *Shehadeh v. Chesapeake & Potomac Telephone Co.*, 595 F.2d 711, 720 (D.C.Cir.1978), clearly establishes that "dissemination of adverse references for reasons condemned by Title VII constitutes an unlawful 'employment practice' within [the] contemplation" of the statute.[59] In the proceedings below the District Court found as a fact that appellant suffered no discrimination on account of his race, and appellant does not challenge that finding for purposes of this appeal.[60] The District Court did, however, accept the administrative determination that the unfavorable supervisory evaluation submitted in conjunction with Smith's NAVSEA application, and apparently recorded in his NAVELEX personnel file, represented a wrongful "reprisal" against appellant for his EEO activities.[61] Because we accept the District Court's factual determinations regarding both claims,[62] the only remaining question is whether the improper evaluation found by the District Court to have occurred rested on "reasons condemned by Title VII." *Shehadeh v. Chesapeake & Potomac Telephone Co., supra*, 595 F.2d at 720. Only when a reprisal is based on factors specifically des-

ignated as illegal can the statute be invoked. *Id.* at 723.

In the present case we have no doubt concerning the statute's applicability. In order to encourage private efforts to enforce the law, the plain language of Title VII prohibits reprisals against employees for their participation in EEO activities. Under the statute it is unlawful "for an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, *assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.*"[63] Smith's EEO work, performed pursuant to a designation by the Department of the Navy, plainly falls within the protective ambit of the statutory language. It is the explicit function of EEO officers to "assist" in "investigation[s]" and "proceeding[s]" under Title VII, and it is for work of this kind that Smith was penalized. This is not a case in which evidence suggests that Smith devoted excessive time to his EEO duties.[64] Thus we are not confronted with an argument that Smith was penalized for *not* devoting sufficient hours to his engineering work—the 75 percent of his work time called for by his job description.[65] Rather, Smith was found to be the victim of an "improper consideration of his EEO

---

**59.** Courts in other circuits have at least implicitly upheld the same view. *See Pantchenko v. C. B. Dolge Co.*, 581 F.2d 1052 (2d Cir. 1978) (plaintiff states cause of action by alleging that former employer failed to furnish letters of recommendation in retaliation for filing discrimination charges with Equal Employment Opportunity Commission); *Rutherford v. American Bank of Commerce*, 565 F.2d 1162 (10th Cir. 1977) (advising prospective employer that a former employee has filed sex discrimination charges violates Title VII); *EEOC v. Western Publishing Co.*, 502 F.2d 599 (8th Cir. 1974) (EEOC is entitled to enforce subpoena to investigate charge that racial motivation underlay adverse employment references).

**60.** Brief for appellant at 11 n.2.

**61.** Memorandum Opinion at 8, JA 26a.

**62.** In reviewing the trial court's findings of fact this court is governed by the "clearly erroneous" test of Fed.R.Civ.P. 52(a). Although ap-

pellant apparently believes we should do so, *see* brief for appellant at 17, we see no basis for rejecting any of the court's findings under this standard.

**63.** 42 U.S.C. § 2000e–3(a) (1976) (emphasis added). In view of the plain language of the statute, we are unable to understand the view, implicit in the dissent, that a reprisal based on an employee's participation in Title VII enforcement activities is not condemned *per se* by the statute. The statute does not, as the dissent suggests, condemn only those reprisals that are motivated by racial hatred or abstract hostility to EEO. It specifically forbids penalization of participation in protected activities.

**64.** *See* notes 25–30 *supra* and accompanying text.

**65.** *See* Examiner's Findings, *supra* note 24, at 2.

duties" [66]; he was, as we read the record from the District Court, wrongly criticized for performing functions given protected status under Title VII. Accepting the District Court's determinations of fact, we must therefore conclude that Smith established a legal claim, cognizable under Title VII, on which he was entitled to appropriate relief.

In reaching this conclusion we do little more than state explicitly the implicit logic of both the administrative agency and the District Court: both acknowledged the propriety of destroying any wrongfully compiled records as a remedy for the injury done in this case. We add only that this remedy represented an appropriate protection of a legal right guaranteed under Title VII, and that appellant had a valid cause of action to protect that right. It is inconceivable that Congress could have intended the wrong he suffered to lack for remedies under Title VII. As this court has stated before, " 'To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer * * * would be to condone the continued use of the very criteria for employment that Congress has prohibited.' " *Shehadeh v. Chesapeake & Potomac Telephone Co., supra,* 595 F.2d at 722 (*quoting Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1341 (D.C.Cir.1973)).

In the context of the facts of this case, we agree with the implicit judgment of the District Court concerning the appropriate relief. The remedial purpose of Title VII is to make plaintiffs whole. *See, e.g., Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–423, 95 S.Ct. 2362, 2372–2374, 45 L.Ed.2d 280 (1975); *Day v. Mathews, supra,*

530 F.2d at 1084–1085. Here, the findings of the District Court establish that appellant has so far suffered no financial loss as a result of the improper evaluation given by his supervisor. Maintenance of the prohibited assessment in Smith's personnel file would damage him by threatening his prospects for future promotions or merit awards. Because no financial harm has yet been shown to have occurred, however, appellant can be restored to where he would have been "but for" the discriminatory act by destruction of the offending appraisal. Although appellant argues that additional relief would be appropriate, partly to create a disincentive to employers to engage in similar violations,[67] we think further remedial measures are unwarranted by the facts here present. We do not, however, foreclose the possibility of monetary damages or other relief in a case revealing willful or repeated violation of the statutory standard.

### III. ATTORNEY'S FEES

Because it misunderstood the necessary elements of a cause of action under Title VII, the District Court seems to have assumed that appellant could not be considered a "prevailing party" in a Title VII lawsuit.[68] As our discussion has indicated, however, appellant did in fact state a legally adequate cause of action under Title VII; and, on the facts found by the District Court, he was entitled, not only to a favorable judgment on his claim and to appropriate relief, but to eligibility for attorney's fees as a prevailing party under that statute, both at the administrative level and in the courts.[69]

---

**66.** *Id.* at 4.

**67.** *See* brief for appellant at 21. Appellant asks for injunctive relief or priority consideration for future promotions, or both.

**68.** *See* Memorandum Opinion at 9, JA 27a ("[T]here has been no finding of discrimination with respect to any of defendant's actions."). Within the context of the statute the term "discrimination" obviously refers to wrongful and punitive acts based on unlawful retaliatory mo-

tives as well as to disparate treatment based directly on race and other condemned factors.

**69.** The term "prevailing party," as it appears in the pertinent section of Title VII, 42 U.S.C. § 2000e–5(k) (1976), encompasses persons who are either wholly or partially successful at both trial and administrative levels. *See Foster v. Boorstin,* 561 F.2d 340 (D.C.Cir.1977); *Parker v. Califano,* 561 F.2d 320 (D.C.Cir.1977).

## IV. CONCLUSION

For the reasons stated above, the judgment of the District Court on the validity of appellant's claim of illegal reprisal under Title VII must be reversed, and appellant, who is legally entitled to the relief granted by the District Court, must be recognized as a prevailing party eligible for consideration for attorney's fees. Accordingly, the cause must be remanded to the District Court for reconsideration of appellant's motion for an award of attorney's fees in the administrative proceedings, in the District Court, and in this court.

*Reversed and remanded.*

MacKINNON, Circuit Judge (dissenting).

Congress intended the Civil Rights Act to protect against specified forms of employment discrimination—discrimination "because of" the employee's membership in a protected class, 42 U.S.C. § 2000e–2, and discrimination "because" the employee has engaged in protected activity, 42 U.S.C. § 2000e–3. The Act does not protect an employee from *all* discrimination simply because he happens to belong to a protected class or happens to have engaged in protected activities. In the instant case the majority orders attorney's fees paid under the Civil Rights Act to an employee in the absence of any specific finding that he has suffered any discrimination prohibited by the Act.

The relevant findings are in fact to the contrary. The Complaints Examiner found that supervisor Bednar

> resented the time complainant [Smith] spent performing his duties as an EEO counselor, *not because of antipathy for the EEO program*, but because of his inability to hold complainant accountable for all his time and efforts while under his supervision.

(Examiner's Findings, *supra* note 24, at 2–3 (emphasis added).)

The Secretary of the Navy concurred "*in the findings*, recommended decision, and recommended corrective action of the Complaints Examiner." (Secretary's Decision, *supra* note 11, at 3 (emphasis added).) The

district court, after a trial *de novo*, essentially adopted the Secretary's findings: "In this case there has been no finding of discrimination with respect to any of defendant's actions.... The sole finding in favor of plaintiff was that his supervisory evaluation reflected an improper consideration of his EEO duties ...." (App. 27a.)

This language reflects that this case involves an ordinary judgment of an employee's work based upon the supervisor's view that the employee (Smith) was spending too much time on collateral activities and insufficient time on his principal duties as an electronics engineer. Such a case is completely outside the Civil Rights Act and this court has no authority to make its own findings. If the findings are incomplete, the court should remand for a specific finding as to whether there was a reprisal based on racial discrimination in any respect.

The majority asserts that the "plain language of the statute ... specifically forbids the penalization of participation in *protected activities*." Majority Opinion at note 63. It then refers to the section of the statute making it unlawful

> for an employer to discriminate against any of *his employees* * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, *assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.*

42 U.S.C. § 2000e–3 (emphasis added). This section does not have the breadth the majority would ascribe to it. In any event the majority has failed to show that Smith was penalized for engaging in protected activities.

Section 2000e–3 appeared in the original Civil Rights Act of 1964 (78 Stat. 257), which applied only to private employers. Read in the context in which it was written, section 2000e–3 evidently claims to protect employees who have opposed their employer in a civil rights case by engaging in the activities the section describes. When the Act was amended in 1972 to apply to em-

ployees "in military departments ... [and United States] executive agencies ... [etc.]" (86 Stat. 111, codified in 42 U.S.C. § 2000e–16), the pertinent language of section 2000e–3 as quoted above was not altered in any respect. The application of section 2000e–3 is thus influenced by the earlier expressed congressional intent to shield from retaliation those employees who have risked their employer's displeasure by publicly opposing the employer in civil rights claims. This provision of the Act was not designed to protect those, such as EEO counselors, whose own employer, the United States, has assigned them to work on civil rights matters, short of some showing of animus based on the race, color, sex, religion or national origin of the affected employee. Mere participation in EEO work is insufficient.

Be that as it may, the majority errs in suggesting that Smith was "penaliz[ed] [for] participation in protected activities." The penalty of the adverse supervisory appraisal was imposed not because of Smith's support of EEO claims but because he appeared to be spending too much time away from his principal job as an engineer. Supervisor Bednar believed Smith missed more work deadlines than did other employees (Tr. 226) and that the duration of his absences from work exceeded the 25% of his working hours that he was authorized to devote to EEO work. (Tr. 279.) This criticism of the quality and quantity of Smith's work cannot be transformed into a Title VII violation, when there is no finding that Bednar in evaluating Smith's work was attempting to frustrate EEO efforts to stop discrimination based on race, color, sex, religion or national origin. The complaints examiner found that the supervisor displayed no "antipathy" toward EEO in general and *there is no taint whatsoever that Bednar was motivated by any anti-EEO animus.* Moreover, there is no finding that Bednar retaliated against Smith for any particular exercise of protected activity.

Thus, Smith's supervisory evaluation was based upon what appeared to be an insufficient attention to his principal job as an engineer, and not upon the fact that the collateral activity detracting from his job performance was EEO activity. The complaints examiner explained: "Mr. Bednar's appraisal resulted from his frustration and resentment at the loss of control he had over complainant during the time he spent performing EEO duties ...." (Examiner's Findings, *supra* note 24, at 3.) From this the majority distills a finding that "Bednar had penalized Smith for his work as an EEO counselor." Majority Opinion at 5. Yet, had Smith been performing other employer-authorized work, work for some other outside project, his treatment by his supervisor, insofar as the findings reveal, would have been just the same. *If the majority's theory is correct no EEO employee could be disciplined for inefficiency in doing EEO work because, as with Smith, they could claim they were engaged in protected EEO activity.* But one engaged in EEO work does not acquire immunity from being treated as a normal government employee with respect to the performance of his work.

Moreover, if the majority opinion were good law, no employee with collateral EEO responsibilities could be disciplined for inefficiency, loafing, insubordination, failure to meet work deadlines or other employee deficiencies if he could attribute his inadequacies to the demands of his EEO work. But that is not enough; there must be some specific finding that the employer discriminated "because" the employee chose to engage in central activities protected by the Civil Rights Act. *E. g., Pendleton v. Rumsfeld,* 628 F.2d 102 (D.C.Cir.1980) (EEO counselors can be disciplined for actively participating in an *unauthorized* disruption of supervisor's office even though the occasion was a demonstration against racial discrimination); *Jeffries v. Harris County Community Action Ass'n,* 615 F.2d 1025, 1036 (5th Cir. 1980) (employee may be disciplined for surreptitious copying of agency records, even if the reason was to publicize unlawful employment practices); *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 230 (1st Cir. 1976) ("employee does not enjoy immunity

from discharge for misconduct merely by claiming that at all times she was defending the rights of her sex by 'opposing' discriminatory behavior"). No finding of such a discriminatory intent is present in this case, and, what is fatal to the majority decision, there is an express finding to the contrary.

Legitimate civil rights cases are harmed, rather than aided, when a court transforms what appears to be an ordinary case of employment discrimination into a Civil Rights Act violation. Such overreaching to find civil rights violations when a minority employee is adversely appraised solely for work related deficiencies creates opposition from fair minded people to legitimate civil rights cases. I cannot interpret the statute to find that "protected activity" extends to protecting an employee who spends too much time in EEO work away from his principal job to the detriment of his regular work.

The court also is using this case as a vehicle to attempt to write law in an area that was never briefed or argued on appeal. For the foregoing reasons I therefore dissent.