Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S. App. D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued May 6, 2005             Decided July 1, 2005

No. 04-5061

MELVIN PORTER,
APPELLANT

v.

ANDREW S. NATSIOS, ADMINISTRATOR,
UNITED STATES
AGENCY FOR INTERNATIONAL DEVELOPMENT,
APPELLEE

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01954)

―――――

*Robert K. Kelner* argued the cause for appellant. With him on the briefs were *Eric C. Bosset, Noah B. Monick*, and *Susan E. Huhta.*

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Michael J. Ryan*, Assistant U.S. Attorney. *R.*

*Craig Lawrence* entered an appearance.

Before: GINSBURG, *Chief Judge*, and ROGERS and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Melvin Porter sued his employer for violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2000), after he was passed over for promotion to three different GS-15 positions. Although the jury rejected his allegations of racial discrimination, it found that retaliation against him for his previous complaints of racial discrimination was a motivating factor in his employer's decision not to select him for two of the GS-15 positions and awarded him $30,000 in compensatory damages. As further relief, the district court awarded Porter prejudgment interest on the damages award, his attorney's fees and costs, and enjoined the employer from retaliating against Porter in the future, but denied his request for back pay and placement in a GS-15 position. The only issue on appeal is whether the district court abused its discretion by denying an award of back pay and a GS-15 placement. Porter contends it did for two reasons: first, because the district court erred as a matter of law by determining that the employer would not have promoted Porter to either of the two GS-15 positions in the absence of retaliation, after deciding, upon Porter's objection, not to instruct the jury on the same issue under the Civil Rights Act of 1991 ("1991 Act"), 42 U.S.C. § 2000e-5(g)(2)(B) (2000); and second, because the district court, in rejecting Porter's request for back pay and placement in a GS-15 position, failed adequately to consider the deterrent purpose of Title VII, and clearly erred in finding that the employer would not have selected Porter for either GS-15 position in the absence of retaliation. We hold that the district court did not abuse its discretion in determining under 42 U.S.C. § 2000e-5(g)(1) that

back pay and a GS-15 placement did not constitute appropriate equitable relief. Accordingly, we affirm the judgment of the district court.

**I.**

Melvin Porter, an African-American male, has been employed by the United States Agency for International Development ("USAID") since 1985. Since his promotion to a GS-14 position in 1987, he has been repeatedly passed over for advancement to a GS-15 position, despite receiving numerous positive performance evaluations. Porter claims that USAID's failure to promote him "is part of a larger atmosphere of hostility and opposition towards the professional advancement of black males within the Agency." Complaint ¶ 16, at 3. In 1992 and 1994, Porter filed two Equal Employment Opportunity ("EEO") complaints alleging racial discrimination, which were later settled. In 1995, according to Porter, USAID transferred him from the Office of Human Resources, where he had been employed since 1985, to the Bureau for Policy and Program Coordination because of hostility toward him within the Office of Human Resources for filing his 1994 EEO complaint. *Id.* ¶ 15, at 3.

In April 1996, Porter applied for a GS-15 position in the Bureau for Latin America and the Caribbean ("LAC"), but the position went to an Asian-American female. Porter maintains that he was denied a fair opportunity to compete for the position when his name was initially omitted from the list of best qualified candidates, that a less-qualified candidate was pre-selected for the position before the vacancy was announced, and that USAID discriminated against him on the basis of his race and gender and retaliated against him for his prior EEO activity, because an official named in his two EEO complaints had participated in the promotion decision. *Id.* ¶¶ 17-19, at 4. Two years later, in March 1998, when Porter applied for a GS-15

position in the Personnel Operations Division ("POD") of the Office of Human Resources, a white male who Porter claims had no experience with the agency's foreign service personnel system was selected for the position. Porter maintains that he was denied the POD position because of his race and his prior EEO activity. *Id.* ¶ 21, at 4-5. In April 1998, Porter applied for another GS-15 position in the Executive Management ("EM") Division of the Office of Human Resources. Although he did not initially rank among the best qualified candidates, he later received a perfect score on an independent evaluation of the candidates, at which point the agency canceled the vacancy announcement. USAID re-advertised the position in November 1998 as a foreign service position and selected a white male foreign service officer who Porter alleges had no substantive experience with personnel management. *Id.* ¶¶ 22-26, at 5. Porter maintains that USAID's actions in connection with the EM position were based on racial discrimination and retaliation for his prior EEO activity. Porter also claims that he was denied a position on the agency's Special Awards Committee because of his race and his prior EEO activity. *Id.* ¶¶ 27-28, at 6.

On May 2, 2001, Porter sued USAID for discriminating and retaliating against him in violation of Title VII. Specifically, the complaint alleged "a continuous and uninterrupted course of discriminatory conduct that occurred between 1996 and the present, during which time Caucasian and Asian individuals with inferior qualifications were selected for positions within the Agency for which [he] was qualified and for which he had applied." *Id.* ¶ 3, at 2. The complaint sought an injunction against future discrimination and retaliation, as well as relief that would "make [Porter] whole," including back pay and benefits, placement in a GS-15 position that he would have attained but for USAID's discrimination and retaliation, compensatory damages for "emotional distress, physical pain, mental anguish, and humiliation," and attorney's fees and costs.

*Id.* ¶ 39, at 8-9. In its answer to the complaint, USAID admitted that Porter had received numerous positive performance evaluations of "exceeds fully successful," "excellent," and "exceptional," but denied all allegations of discrimination and retaliation. It asserted in its pretrial statement of defenses that "there was no discrimination or retaliation in the three selections at issue" and that Porter "would not have been selected for any of the three positions even in the absence of discrimination." Def.'s Pretrial Statement ¶ 3, at 2. USAID also proposed a jury instruction and special interrogatory on the "same action" affirmative defense established by the 1991 Act, 42 U.S.C. § 2000e-5(g)(2)(B), asking the jury to determine, if it found discrimination or retaliation, whether USAID "would have taken the same action even in the absence of discrimination or retaliation."

At the close of the evidence, the district court sustained Porter's objection to USAID's request for a jury instruction on the "same action" affirmative defense. Instead, as Porter requested, the district court instructed the jury to determine whether discrimination or retaliation was "a motivating factor" in USAID's decision not to promote Porter to each of the three positions "even though other factors may also have played a role in that decision." The instruction stated that "Mr. Porter is not required to prove that his race or protected activity was the only reason for USAID's decision," but that "[i]f you find that Mr. Porter has proven by a preponderance of the evidence that racial discrimination or retaliation more probably than not motivated USAID, then you must find for Mr. Porter." Finding that USAID had not discriminated against Porter on the basis of his race or gender with respect to any of the three positions, but that it had retaliated against him in deciding not to promote him to the POD and EM positions, the jury awarded Porter $15,000 in compensatory damages for each of those claims.

Porter then petitioned the district court for equitable relief, including back pay and placement in a GS-15 position, relying on *Lander v. Lujan*, 888 F.2d 153 (D.C. Cir. 1989), for the proposition that district courts "must strive to grant 'the most complete relief possible' in cases of Title VII violations," *id.* at 156 (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 764 (1976)), and "[i]n particular, the courts must make the victim 'whole' by 'plac[ing him], as near as may be, in the situation he would have occupied if the wrong had not been committed,'" *id.* (second alteration in original) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19 (1975)).  USAID, in turn, again invoked the "same action" affirmative defense under § 2000e-5(g)(2)(B), and asked the district court to find by a preponderance of the evidence that USAID would have taken the same action regarding the POD and EM positions in the absence of retaliation.  Concluding that the jury verdict left it free to decide the "same action" issue, the district court credited the testimony of USAID's witnesses and found that the agency would not have selected Porter for either of the GS-15 positions in the absence of retaliation.  Accordingly, the district court enjoined USAID from future retaliation and awarded Porter his attorney's fees and costs, as well as prejudgment interest on his damages award, but denied back pay and a GS-15 placement, concluding that these remedies were unnecessary to make Porter whole.

## II.

On appeal, Porter contends that the district court committed legal and factual errors in denying him back pay and placement in a GS-15 position.  In reviewing the district court's determination of an appropriate remedy under Title VII, the court considers "whether the District Court was 'clearly erroneous' in its factual findings and whether it 'abused' its traditional discretion to locate 'a just result' in light of circumstances peculiar to the case." *Albemarle*, 422 U.S. at 424

(quoting *Langnes v. Green*, 282 U.S. 531, 541 (1931)); *see also Peyton v. DiMario*, 287 F.3d 1121, 1125-26 (D.C. Cir. 2002); *Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995). While the district court has "wide discretion to award equitable relief," the question for this court is whether the district court "failed to consider a relevant factor" or "relied on an improper factor, and "whether the reasons given reasonably support the conclusion." *Peyton*, 287 F.3d at 1126 (quoting *Barbour*, 48 F.3d at 1278). Our deferential standard of review comports with the recognition that the district court is in the best position to determine the appropriate equitable relief in light of the particular facts of the case, as it heard all of the evidence and observed all of the witnesses at trial. *See* Fed. R. Civ. P. 52(a); *Bishopp v. District of Columbia*, 788 F.2d 781, 785-86 (D.C. Cir. 1986).

Title VII makes it an "unlawful employment practice" for an employer to discriminate against an individual "because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), or "because he has opposed any practice made an unlawful employment practice by this subchapter," *id.* § 2000e-3(a). Absent direct evidence of intentional discrimination or retaliation, *see, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), an employee can establish a prima facie case of an unlawful employment practice under the "single motive" or "pretext" framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), if he proves by a preponderance of the evidence that he "applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination [or retaliation]." *Burdine*, 450 U.S. at 253; *see McDonnell Douglas*, 411 U.S. at 802. The burden of production then shifts to the employer to rebut the presumption of discrimination or retaliation by presenting

evidence of a legitimate reason for its employment decision. *See Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802. The employee retains the ultimate burden of persuasion and may prove intentional discrimination or retaliation by demonstrating that the employer's proffered legitimate reason is pretextual and not the "true reason" for the employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804.

The "mixed motive" framework was established by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), in recognition that the statutory phrase "because of" does not mean "*solely* because of," *id.* at 241. Under that framework, an employee could establish a prima facie case of an unlawful employment practice by demonstrating that discrimination or retaliation played a "motivating part" or was a "substantial factor" in the employment decision. *Id.* at 244 (plurality opinion); *id.* at 259 (White, J. concurring in the judgment); *id.* at 276 (O'Connor, J., concurring in the judgment). The employer could avoid all liability, however, if it proved that it would have made the same employment decision in the absence of the unlawful motive. *Id.* at 244-45.

Congress responded to the *Price Waterhouse* mixed motive framework by enacting section 107(a) of the 1991 Act, Pub. L. No. 102-166, 105 Stat. 1075, which amended Title VII to provide standards for mixed motive cases. *See Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148, 2151 (2003). The 1991 Act provided for employer liability based on evidence that an impermissible consideration was "a motivating factor" in the employer's decision:

> [A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating*

>*factor* for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m) (emphasis added). In such cases, the 1991 Act also limited the employer's exposure to certain remedies by establishing a "same action" affirmative defense:

>On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the *same action* in the absence of the impermissible motivating factor, the court —
>
>(i) may grant declaratory relief, injunctive relief . . ., and attorney's fees and costs . . . ; and
>
>(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment . . . .

*Id.* § 2000e-5(g)(2)(B) (emphasis added). Thus, the mixed motive framework of the 1991 Act allows an employee to establish a Title VII violation under § 2000e-2(m) without proving that an impermissible consideration was the sole or but-for motive for the employment action, while providing the employer with a "limited affirmative defense" under § 2000e-5(g)(2)(B) "that does not absolve it of liability, but restricts the remedies available to a plaintiff." *Desert Palace*, 123 S. Ct. at 2151.

As a threshold matter, we note that Porter's case implicates several issues that have not been presented to the court by the parties on appeal. First, although every circuit to address the issue has held that the mixed motive provisions of the 1991 Act

do not apply to retaliation claims,[1] it remains an open question in this circuit. *See Borgo v. Goldin*, 204 F.3d 251, 256 n.6 (D.C. Cir. 2000). Because neither party contends that the 1991 Act does not apply to Porter's retaliation claim, the issue will remain an open question in this circuit after this appeal. Second, for reasons we will explain, it is unnecessary to decide whether the "same action" defense under § 2000e-5(g)(2)(B) is an issue reserved for the jury. Third, in the absence of a cross-appeal by USAID, the court has no occasion to decide whether the district court erred in denying USAID's request for a jury instruction on the "same action" defense.

**A.**

Porter contends that the district court erred as a matter of law in determining for itself whether USAID would have selected Porter for the POD or EM positions in the absence of retaliation. He maintains that the "same action" defense did not apply to his case, and that even if it did, it should have been decided by the jury rather than the district court. Porter first contends that the "same action" defense does not apply to his case because both parties litigated the case as a single motive or pretext case, not a mixed motive case. Porter points out that his consistent position throughout trial was that discrimination and retaliation were the only plausible reasons for USAID's decision not to promote him to each of the three GS-15 positions and that USAID's consistent position was that discrimination and retaliation played no role whatsoever in its decision not to

---

[1]  *See, e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001); *Speedy v. Rexnord Corp.*, 243 F.3d 397 (7th Cir. 2001); *Matima v. Celli*, 228 F.3d 68 (2d Cir. 2000); *Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848 (8th Cir. 2000); *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544 (4th Cir. 1999); *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997); *Tanca v. Nordberg*, 98 F.3d 680 (1st Cir. 1996).

promote him to each of those positions. Porter also points to the district court's denial of a jury instruction on the "same action" defense after he objected on the ground that USAID "took [the defense] off the table" when all of its witnesses "categorically den[ied] that any impermissible motive played a role in the decision-making."

To the extent Porter contends that USAID waived the "same action" defense or failed to provide adequate notice of its intention to raise the defense at the remedial stage of the proceedings, that contention is unavailing. While USAID did not assert the defense in its answer to the complaint, an "omission of an affirmative defense is not fatal as long as it is included in the pretrial order." *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1185 (11th Cir. 1999) (citing Fed. R. Civ. P. 16(e)). In its pretrial statement of defenses, USAID asserted not only that "there was no discrimination or retaliation in the three selections at issue," but also that Porter "would not have been selected for any of the three positions even in the absence of discrimination." Along with its pretrial statement, USAID proposed a jury instruction on the "same action" defense asking the jury to find whether USAID would have taken the same action in the absence of discrimination or retaliation and to note that finding on its verdict form. Moreover, USAID stated during a pretrial conference that it intended to raise the "same action" defense with respect to the issue of back pay. Therefore, USAID gave adequate notice of its intention to raise the "same action" defense at the remedial stage of the proceedings.

Porter's contention that the "same action" defense is inapplicable because the case was litigated on a single motive or pretext theory is also unavailing because, consistent with the jury instructions, the jury did not find that retaliation was the sole or "true" motive for USAID's decision not to promote Porter to the POD or EM positions. Rather, under the standard

for mixed motive cases established in § 2000e-2(m), the jury found that retaliation was "a motivating factor" in USAID's decision not to promote Porter. It is true that the jury instructions referred to a pretext theory, stating that "Mr. Porter contends that [USAID's] explanations [for its decision] are a pretext for unlawful discrimination and retaliation" and that "Mr. Porter can prove pretext by persuading you by a preponderance of the evidence that his race and/or prior protected activity was more likely the basis for his non-selections than the reasons given by USAID, or by persuading you that the reasons given by USAID are not believable." Nonetheless, the instructions clearly stated that the jury did not have to find that an impermissible consideration was the "only reason" or the "real motive" for USAID's decision in order to find for Porter. Had Porter wanted to establish liability under the higher evidentiary burden of a single motive theory, he could have requested an instruction asking the jury to find that an impermissible consideration was the sole motive, rather than "a motivating factor," for USAID's decision not to promote him to each of the GS-15 positions. Instead, he agreed to an instruction that relied on a mixed motive theory to establish liability upon a lesser evidentiary showing and thus exposed himself to the possibility of a "same action" defense.

To the extent Porter contends that the district court's determination of the "same action" issue violates the "law of the case" established by the court's denial of a jury instruction on the "same action" defense, that contention also fails. Nothing in the record indicates that the district court denied the instruction on the ground that the defense did not apply to Porter's case; rather, the court appeared to be concerned about the length of the special interrogatories required by such an instruction. Indeed, because "the questions of statutory violation and appropriate statutory remedy are conceptually distinct," *Johnson v. Brock*, 810 F.2d 219, 223 (D.C. Cir. 1987) (quoting *Smith v.*

*Sec'y of the Navy*, 659 F.2d 1113, 1220 (D.C. Cir. 1981)) (internal quotation marks omitted), the district court properly distinguished between its denial of a jury instruction on the "same action" defense under § 2000e-5(g)(2)(B) and its determination of appropriate equitable relief under § 2000e-5(g)(1), *cf. id.* at 224 (citing *Day v. Mathews*, 530 F.2d 1083, 1085 (D.C. Cir. 1976) (per curiam)). Under § 2000e-5(g)(1), a district court may enjoin an employer from engaging in an unlawful employment practice and may "order such affirmative action as may be appropriate," including the placement of an employee in a position with back pay, "or any other equitable relief as the court deems appropriate." During the remedial stage of the proceedings, the district court may make factual findings to determine appropriate "make whole" relief under § 2000e-5(g)(1), *cf. Albemarle*, 422 U.S. at 424, as long as the findings are consistent with the jury verdict, *see Fogg v. Ashcroft*, 254 F.3d 103, 110-11 (D.C. Cir. 2001). Here, the district court concluded that because the jury verdict did not address whether USAID would have taken the same action in the absence of retaliation, the verdict left the district court free to decide the issue during the remedial stage in determining appropriate equitable relief under § 2000e-5(g)(1). Because the district court's finding was not inconsistent with the jury verdict, we conclude that the court did not abuse its discretion.

Porter further contends that the district court erred as a matter of law in deciding the "same action" issue because the 1991 Act reserves that issue to the jury. Pointing out that the 1991 Act created both the statutory "same action" affirmative defense and the right to a jury trial under Title VII, Porter contends that, consistent with the usual treatment of affirmative defenses as jury issues, *see, e.g.*, *Tri County Indus., Inc. v. District of Columbia*, 200 F.3d 836, 840-41 (D.C. Cir. 2000), Congress intended for the jury, as the trier of fact, to determine whether the employer would have taken the same action in the

absence of an unlawful motive. While dicta in various cases indicate that the "same action" defense is a factual issue typically decided by the jury, *see e.g.*, *Desert Palace*, 123 S. Ct. at 2153, 2154; *Borgo*, 204 F.3d at 257-58; *Pulliam*, 185 F.3d at 1187, we need not decide whether the defense must be decided by the jury under the 1991 Act or other applicable law. Even if the court were to assume that the 1991 Act reserves the "same action" defense under § 2000e-5(g)(2)(B) for the jury, Porter waived any right to a jury instruction on that defense when he objected to USAID's request for that instruction and agreed instead to an instruction that asked the jury only to determine liability based on a finding of discrimination or retaliation as "a motivating factor." Having chosen to prove liability under the less onerous standard of § 2000e-2(m), Porter cannot now disavow that choice to avoid facing a "same-action" response to his request for equitable relief.

Therefore, we hold that the district court did not err as a matter of law in determining, as part of its assessment of the appropriate equitable relief under § 2000e-5(g)(1), whether USAID would have taken the same action with respect to the POD and EM positions in the absence of retaliation.

**B.**

Porter's other contentions that the district court abused its discretion by denying him back pay and a GS-15 placement are also unavailing. His contention that the district court failed to give adequate consideration to the deterrent purpose of Title VII is belied by the record. In denying Porter's motion for reconsideration of the denial of back pay and a GS-15 placement, the district court stated:

> My conclusion in this case, after hearing all the evidence and considering the entire record, was that [Porter] would not have been given either of the two

GS-15 positions he sought in the absence of the retaliation the jury found; that the jury's award of $30,000 did in fact restore him to the position where he would have been if not for the retaliation, namely fairly compensated for the insult of retaliation, but still at GS-14 and still eligible for promotion; and that an injunction against USAID would not only provide [Porter] with an extra measure of protection in his future applications, but also help eradicate any vestiges of a culture of retaliation that may have existed at USAID.

By granting relief that it concluded would make Porter whole and prevent future retaliation, the district properly addressed the "twin statutory objectives" of Title VII. *Albemarle*, 422 U.S. at 421. Moreover, while Porter invokes the presumption in favor of awarding back pay established in *Albemarle Paper Co. v. Moody*, that presumption rests partly on the premise that back pay is necessary to make the employee whole because the employee would have attained the position but for the employer's discrimination or retaliation. *See id.* at 418-21. Because the district court found, consistent with the jury verdict, that Porter would not have attained either of the GS-15 positions in the absence of retaliation, it did not abuse its discretion by denying back pay and a GS-15 placement.

Finally, contrary to Porter's contention, the district court's finding that USAID would have taken the same action in the absence of retaliation is not clearly erroneous. *See* Fed. R. Civ. P. 52(a). The district court credited the testimony of John Martin, who was the selecting official for the POD position, and Sandra Malone-Gilmer, who was a member of the interviewing panel, that the candidate selected for the POD position was the panel's unanimous first choice following both of his interviews; the district court also credited the testimony of Linda Lion, the

deputy assistant administrator for human resources, that she wanted to fill the EM position with a foreign service officer because most of the EM Division's clientele were foreign service officers. The district court found this testimony "both credible and compelling." While the district court observed that the jury apparently found that USAID retaliated against Porter in the processes leading up to the certification of finalists for the POD position and to the decision to cancel the vacancy announcement for the EM position, it concluded that the preponderance of the record evidence regarding the actual selections for the two positions "compels the conclusion that [the same two candidates] would have been selected . . . had there been no retaliation." On reconsideration, the district court noted that Porter's case-in-chief with respect to the POD and EM positions "consisted almost entirely of his own testimony" and the testimony of one other witness who "had nothing to do with" the interview process for the POD position or the decision to re-advertise the EM position as a foreign service position.

Because the district court heard all of the evidence and observed all of the witnesses at trial, this court defers to the district court's decision to credit testimony unless the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder could not credit it." *Bishopp*, 788 F.2d at 786. Porter makes no such showing. Rather, he asks this court to re-weigh the evidence, contending that the district court abused its discretion by failing to resolve factual uncertainties in his favor. *See* Br. of Appellant at 14 (citing *Day*, 530 F.2d at 1086; *Trout v. Garrett*, 780 F. Supp. 1396, 1407 (D.D.C. 1991)). Porter maintains that he was the best candidate for the POD position, pointing to evidence of his superior knowledge of USAID's personnel policies, and he attempts to discredit Martin by referring to his own testimony that Martin fell asleep during his interview. Given his superior qualifications and USAID's policy preference for an internal candidate, Porter contends that

the "most reasonable inference under the circumstances" is that he would have been selected for the POD position if Martin had not retaliated against him. *Id.* at 16. However, even were we to agree with Porter's view of the evidence, the district court's finding is not based on an "utterly implausible account of the evidence." *Bishopp*, 788 F.2d at 786. The district court credited Martin's testimony that the outside candidate was the interviewing panel's "unanimous first choice" for the POD position because of his impressive responses to the interview questions, his experience in overseas personnel management and reorganization, and his expertise in the field, as demonstrated by his teaching experience and publications. The testimony of the other members of the interviewing panel corroborate Martin's testimony that the outside candidate outperformed Porter in the interviews. Upon crediting this evidence, the district court could permissibly find, *see Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985), that in the absence of retaliation Porter would not have been promoted to the POD position because the outside candidate was better qualified and had a more impressive interview.

Regarding the EM position, Porter's emphasis on the conflicting testimony of Linda Lion and of another USAID witness only underscores why this court should defer to the district court's credibility determinations. While Porter points to evidence that retaliation motivated Lion's decision to cancel the EM vacancy announcement and to re-advertise the position as a foreign service position, the jury did not find that retaliation was the only reason for these actions. Therefore, the district court could credit Lion's testimony that she wanted to hire a foreign service officer for the EM position because most of the EM Division's clientele were foreign service officers, and it could permissibly conclude from that testimony that Lion would have canceled the vacancy announcement and re-advertised the position as a foreign service position even if she had not

retaliated against Porter. Consequently, Porter fails to show that the district court clearly erred in finding, based on the credited testimony, that USAID would have taken the same action with respect to the POD and EM positions in the absence of retaliation.

Accordingly, because Porter fails to show that the district court abused its discretion by denying back pay and placement in a GS-15 position as part of his "make whole" relief, we affirm the judgment awarding Porter $30,000 in compensatory damages, with prejudgment interest, and his attorney's fees and costs, and enjoining USAID from retaliating against Porter for his protected Title VII activities.