**Karen J. MATHIS, Plaintiff,**

v.

**William R. PERRY, Defendant.**

No. Civ.A. 96CV394–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

June 23, 1997.

---

Michael P. Deeds, Kestell & Associates, Washington, DC, for Plaintiff.

Jeri K. Somers, Office of the U.S. Atty., Alexandria, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Karen J. Mathis ("Mathis") instituted this action against her employer, the Defense Contract Audit Agency,[1] ("DCAA" or "defendant") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended.[2] Mathis seeks damages and injunctive relief for the defendant's purported discrimination on account of Mathis' race (black) and gender (female) and for defendant's alleged retaliation for Mathis' filing of a discrimination complaint. Mathis also claims that she was subjected to a hostile

---

1. William R. Perry, former Secretary of the Department of Defense, is the titular defendant.

2. The first paragraph of Mathis' Complaint set forth that this action was additionally brought pursuant to 42 U.S.C. § 1981(a). However, no further mention of the Section 1981 claim was made in the Complaint or in the papers filed by either Mathis or the defendant. Nonetheless, Mathis' Section 1981 claim must be dismissed for the reasons set forth below, assuming that 42 U.S.C. § 2000e–16 is not Mathis' exclusive remedy for her discrimination claims.

work environment.[3] Defendant filed a motion to dismiss portions of Mathis' Complaint and also filed a motion for summary judgment. For the reasons set forth below, the defendant's Motion for Summary Judgment is granted.

## STATEMENT OF FACTS

Mathis' discrimination and retaliation claims arise from the conduct of several managers at two separate branches of DCAA: (1) the conduct of Charles Hay, Branch Manager of DCAA's Capital Branch office in Arlington; and (2) the conduct of Augustino Pastro, ("Pastro"), Manager of DCAA's Reston Branch, and William Cochrane, Regional Audit Manager ("Cochrane").[4] To understand and assess Mathis' claims, it is necessary to consider them in the framework in which they arose. Hence, for clarity, and in accordance with the approach taken by the parties in their pleadings, the issues will be discussed in context of the respective branch office and management personnel on which Mathis has focused her claims.

### I. Capital Branch Office

Mathis was first employed by DCAA in June 1980. She made steady, if not remarkable, progress thereafter. In 1990, she received excellent evaluations, was recommended for a promotion and was given a monetary performance award. In 1991, Mathis was promoted to a GM–13 managerial level position and was assigned to work as Special Assistant to the Branch Manager of DCAA's Annandale Office in Springfield, Virginia. In March 1992, after she reportedly complained about the discriminatory and offensive atmosphere in DCAA's Annandale Office, and, upon her request, Mathis was

transferred to the National Academy of Sciences, which is associated with DCAA's Capital Branch office in Arlington, Virginia. Complaint at ¶¶ 8–11; Mathis Aff. at ¶¶ 3, 4. The Capital Branch Office conducts audits of independent defense contractors located within the region for which the Branch has responsibility.

Augustino Pastro ("Pastro") served as Branch Manager of DCAA's Capital Branch office when Mathis was transferred there. In September 1992, Mathis became one of five supervisory auditors, who directly reported to Pastro. DEX 27 at 6. At some point before March 10, 1993, Mathis drafted a memorandum to Pastro, in which she asserted that her workload was heavier than that of the other supervisory auditors.[5] On March 10, 1993, Pastro told Mathis that he would not make any changes to the work plan, which he had established in October 1992, because a new branch manager would soon replace him. Mathis Aff. ¶ 4.

During Pastro's tenure as Capital Branch Manager, Mathis spent more time at the suboffices under her responsibility than did any other supervisory auditor. Mathis claims that this was because she was the only supervisory auditor who had responsibility for major and mobile contractors.[6] In addition, Mathis complained that her allergies were exacerbated by the mildew and dampness of the Capital Branch Office. In response, Pastro exercised his discretion and permitted Mathis to work off-site. DEX 27 at 29.

In March 1993, Charles Hay ("Hay") replaced Pastro as Branch Manager of the Capital Branch Office. After Hay's arrival on the job, but while he was attending a

---

3. The Court has federal question jurisdiction under 28 U.S.C. § 1331; 42 U.S.C. § 2000e–16(c).

4. The parties also spelled "Cochrane" as "Cochran".

5. Pastro allocated workload among the five supervisory auditors through the use of a planning process. The supervisory auditors were then required to develop a plan for performing audit assignments based upon the hours allocated and the priorities assigned to the tasks. DEX 27 at 7–8. Mathis assumed the workload of Leander

Brown and several additional contractors. Mathis Aff. ¶ 4.

6. Mathis complained that the nature of her position required her to travel continually between the branch and mobile offices, resulting in significant hours of overtime. Mathis also complained that she was the only supervisory auditor who signed public vouchers and performed telephone rate requests for a certain zip code, even though another individual incurred cost responsibilities for contractors in that same zip code. Mathis Aff. ¶ 4.

training program away from the office, Mathis removed the majority of her belongings from her office at the Capital Branch and set up shop at SYSCON, a contractor located in Georgetown, Washington, D.C., for which Mathis' team had audit responsibility ("suboffice"). DEX 26, p. 9; DEX 25, p 17. She made no effort to clear this action with Hay, nor had it been previously approved by Pastro.

On May 6, 1993, Hay presented two memoranda to Mathis. DEX 3, 5. The first memorandum, entitled "Observations of My First 30 Days," noted numerous problems with Mathis' performance, including her absence from the office, failure to perform requested assignments, and improper audit planning.[7] DEX 3. Although Mathis takes issue with several portions of Hay's memorandum,[8] she does not deny receiving it. Mathis Aff. ¶ 5.

The second memorandum issued by Hay on May 6, 1993, required Mathis to perform her duties at the Capital Branch Office, rather than at the suboffice. In an effort to accommodate Mathis' allergy sensitivities, Hay offered Mathis the option of working in a different office space within the branch. Hay also reminded Mathis that DCAA's Mid–Atlantic Regional procedures required her to obtain his approval before earning and using credit hours. DEX 5.

Mathis claims that Hay's demands made it difficult for her to work because, unlike the other supervisory auditors, the audit teams for which she was responsible were located at various suboffice locations. Mathis alleges that no other auditor received a similar restriction on his or her duties. That, of course, is not surprising if the allegation in the preceding sentence is true. Finally, Mathis claims that working in the Capital Branch Office would have aggravated her allergies even had she moved to another office space within that branch. Mathis Aff. ¶ 6. Although Mathis offered no support for that assertion, it is undisputed that Mathis was permitted to continue working from the suboffice location, as she wished.[9]

According to Mathis, the only basis to explain Hay's demanding that she use the Capital Branch Office as her base of operations is discrimination. She grounds that conclusion in the following: (1) Hay ignored Mathis' questions and concerns; (2) Hay commented on the appearance of Mathis and

---

7. Specifically, it stated: "Since my arrival here, you have made yourself conspicuous by your absence. You drop notes on my desk after duty hours and on weekends and appear to be totally avoiding me. You have missed internal suspense dates ... Before I was officially assigned you complained to me about the horrendous workload and lack of staff. I requested, after my assignment, that you provide me specifics about the status of your program plan current assignments, and projected shortfalls. Again, I discussed this with you on 20 April, and you offered to fax me the information. I stated that I wanted you to bring your program plan and current assignments into my office, and I would review it with you and make a decision (based on objected shortfalls) as to what programmed assignments your team would not work on. That has not been done to date. On 22 April all supervisors were given a copy of their program plan and requested to comment on potential shortfalls by 30 April. A response has been received from all supervisors except you. In the meantime, you have continued to set up discretionary programmed audit assignments while still carrying a backlog of demand assignments ... It appears to me that proper utilization of available personnel would dictate that you concentrate on your demand assignments and CACA ..." DEX 3.

8. For instance, Mathis claims that it is true that she had missed the internal suspense dates as alleged; however, she was waiting to receive information from a contractor. In any event, Mathis says her failure to meet the deadline resulted in no delay. Mathis also contends that, contrary to Hay's complaint, she previously had handed in her cumulative status report, and had sent Hay a copy of her response to the program plan. Nevertheless, according to Mathis, the latter information was contained in two other sources to which Hay had access. With respect to setting up shop in the suboffice, Mathis claims that she had informed Hay that the nature of her duties and her allergies required her to stay away from the Capital Branch Office as much as possible. Finally, Mathis does not recall Hay's request for additional documentation respecting her workload. Mathis Aff. ¶ 5.

9. Mathis claims that Hay's order that she use the Capital Branch Office as her base was rescinded upon her appeal to the Regional Audit manager, Jim DiCroce. Mathis Aff. ¶ 6. Hay disputes this, and instead says that he and DiCroce concurred that Mathis should be permitted to remain at the Syscon Corporation Office until the building manager corrected the problems related to her health problems. DEX 18 at 3. This disputed issue of fact is not material.

of other female DCAA employees, including their hairstyle and dress; and (3) Hay made gender insensitive comments to Mathis, including "keep [your] skirt on" and "stop [your] bitching." Mathis Aff. ¶ 7.

On June 17, 1993, Hay reminded Mathis that her requirements plan was long overdue and requested that she bring it personally to his office the next business day. DEX 6. According to Mathis, Hay had informed her earlier that day of the changes he wanted made to the plan, but understood that, because Mathis was leaving town for her brother's wedding, the plan would be completed by one of Mathis' senior auditors. Nonetheless, Mathis claims that Hay's insistence on a personal meeting forced her to miss her brother's wedding. Mathis Aff. ¶ 8.

On August 18, 1993 Hay sent Mathis a memorandum, which informed her that changes had been made to the building, which he believed would alleviate her allergy problems. He then directed her to henceforth use the Capital Branch Office as her base of operation. DEX 8. Without even attempting to use the Capital Branch office as a base, Mathis interpreted the environmental impact study of the building and asserted that the remedial steps taken would not cure the conditions which aggravated her allergies. Mathis also claimed that the environmental changes would not obviate her need to spend time at the suboffices due to the nature of her work.[10] Mathis Aff. ¶ 9. Again, it is undisputed that Mathis was permitted to continue working from the suboffice, although the parties differ as to how that came about.

In a second memorandum dated August 18, 1993, Hay detailed a list of work items as to which Mathis was in default. DEX 7.

Mathis alleges that this work was in fact completed and handed in, except for one nonpriority report which needed information contained in a report that had not been completed by a contractor. Mathis Aff. ¶ 9.

On August 19, 1993, Mathis initiated an informal Equal Employment Opportunity ("EEO") complaint, charging race and gender discrimination,[11] based on: (1) Hay's insistence that Mathis use the Capital Branch Office as her base of operations, rather than the suboffice, where she could better supervise her auditors and where her allergies would not be aggravated; and (2) the unfair distribution of workload and staffing. Mathis Aff. ¶ 10; DEX 17; Mathis Decl., Exhibit 1, filed with Plaintiff's opposition to Defendant's Motion to Dismiss (Sept. 25, 1996).

On August 20, 1993, Hay summarized a conversation with Mathis in a memorandum for the file, noting that Mathis continued to complain about his having ordered her to work from the Capital Branch Office. Hay also recorded that, during a discussion with Mathis about her failure to meet deadlines, Mathis replied that she found it difficult to manage her workload as well as her personnel matters.[12] DEX 9. At an unknown date in September, Hay reportedly learned about Mathis' EEO complaint. Hay Dep. at 33.

On September 30, 1993, Hay completed an auditor promotion appraisal form for all auditors. He rated Mathis between Level 1 (candidate needs further development of present skills and abilities in order to meet the fully successful performance expectations for the next higher grade) and Level 2 (candidate has the skill and ability to meet the fully

---

**10.** On September 2, 1993, Mathis responded to Hay's August 18, memorandum, informing him that she had a handicap condition, and that the Rehabilitation Act of 1973 prohibits discrimination on the basis of mental and physical handicap. Mathis also expressed her belief that the environmental testing performed on the Capital Branch office building did not present a valid basis for determining whether the air was still a health problem. Finally, Mathis asserted that DCAA could "reasonably accommodate" her condition by changing her duty station to the suboffice. PEX 9A; DEX 10. Evidence in the record shows that Hay subsequently admitted

that the damp conditions at the Capital Branch Office had not been cured by the modifications. PEX 9.

**11.** Mathis filed a formal complaint on January 18, 1994.

**12.** Hay further recorded that he reminded Mathis that, as a supervisor, she was responsible for handling both facets and that she already had been provided two additional auditors to assist with outstanding tasks.

successful performance for the next higher grade).

By memorandum dated October 6, 1993, Hay asked Mathis to provide documentation to support her assertion that her medical condition was adversely affected by the conditions at the Capital Branch Office notwithstanding that the building had been altered and an environmental study conducted. DEX 12. However, Mathis was permitted to continue working at the Syscon Corporation suboffice.[13]

On October 8, 1993, Hay issued Mathis' performance appraisal which rated her at the low end of the fully successful range. Mathis' overall score was 135, reflecting a combination of Hay's score (125) and Pastro's rating (145).[14] DEX 14. The record shows that Hay gave to a black female the highest score (or at least one of the two highest scores) of all the supervisory auditors, whom he evaluated. Hay Dep. at 29.

Mathis complained that her evaluation score was one hundred points lower than any of the other supervisory auditor's evaluations, all of whom, she alleged, carried lesser workloads than had she. Mathis said that Hay failed to criticize her for deficiencies in the narrative portion of the evaluation, and she also disagreed with the criticisms he levied. As a result of her rating, Mathis says that she was considered unpromotable and that she missed an opportunity to earn a bonus. Mathis Aff. ¶ 11.

On December 17, 1993, Hay refused to permit Mathis to obtain credit for hours worked beyond the normal business day. Hay justified that decision on Mathis' failure to obtain advance approval for the extra work hours, in violation of the Mid–Atlantic Regional Instruction of which Hay had previously made Mathis aware. DEX 15. Mathis

alleges that supervisors routinely give credit retrospectively and that the regulations permit flexibility. In any event, Mathis claims that, in this instance, she had been working on a personnel matter, which the personnel office had requested her to complete immediately. Mathis Aff. ¶ 13.

After the Capital Branch Office closed, and Mathis had been transferred to the Reston Branch, Hay conducted a final exit evaluation of Mathis in April 1994. Hay gave Mathis a score of 125, the same score he had previously given her in October 1993, a low rating within the fully successful range. DEX 16. Mathis contends that Hay misrepresented her rating by evaluating her for work which she did not perform. Mathis Aff. ¶ 14. Hay contends, however, that he understood that, if he had not evaluated a person for a category, he was supposed to score the category as "fully successful", the same score Mathis had received in Hay's previous evaluation.[15] Hay Dep. at 26.

## II. Reston Branch Office

In January 1994, Mathis was transferred to the Reston Branch Office because the Capital Branch office was closed. Her supervisor there was Larry Tatem.[16] Tatem gave Mathis an evaluation score in the high range of the fully successful category in October 1994. Later that month, Tatem was replaced by Pastro. Mathis Aff. ¶ 15.

Almost immediately after transfer to the Reston Branch, Mathis once again became entangled in difficulty. This time she had problems with her subordinates. According to Mathis, Pat Hatcher and Tom Frisicaro, two white former supervisors assigned to work under Mathis as a result of a reduction in force, regularly interacted with auditors directly rather than through her and refused to recognize Mathis as their superior. Math-

13. On October 18, 1993, Mathis submitted medical documentation respecting her allergies. DEX 13. According to Hay, the documentation failed to address whether her condition would be affected by the current conditions in the Capital Branch Office in light of the environmental study. Mathis contends that Hay never requested that information. DEX 13.

14. Hay claims that he could have rated Mathis as unsatisfactory because she had failed to satisfy

the requirements for the rating he actually gave her. Nevertheless, he decided upon the higher rating because he believed that her performance would improve.

15. A "fully successful" is equivalent to a score of "1".

16. The parties have also spelled "Tatem" as "Tatum".

is Aff. ¶ 16. Mathis also claims that she had problems with two other two white subordinates, Judy Barber and Patti Cramer.[17] Mathis Aff. ¶ 17. Mathis appealed to Pastro about these employee problems; Pastro allegedly supported Hatcher, Frisicaro, Barber, and Cramer. *Id.*

Thereafter, Mathis engaged in conduct which led to her suspension without pay, which forms the basis of her discrimination claims respecting the Reston Branch Office.[18] On February 24, 1995, Mathis learned that Cramer and Barber had met with Pastro, and, as a result, Cramer was to be removed from Mathis' team. Mathis then invited Barber and Cramer to her office to talk with them. The accounts of that meeting are in sharp conflict.

According to defendant, Mathis continuously and abusively berated Cramer and Barber in a loud tone, accusing them of trying to undermine her supervisory authority.[19] According to Mathis, however, it was Barber and Cramer who acted abusively toward her.[20] Mathis' version was refuted by a third party who witnessed portions of the encounter. DEX 20. The event was reported to Pastro.

Following this altercation, and in a related incident, Mathis purportedly berated Jawahar Islam, a security staff member.[21] Mathis claims that her discussion with Jawahar Islam was peaceful,[22] but a third party joined Jawahar Islam in discrediting Mathis' account. DEX 20.

Later in February 1995, a contractor, for whose account Mathis was responsible, became involved in negotiations for an extension of a government contract. An issue arose, which the contracting officer stated could be resolved only with DCAA's concurrence. However, when the contractor requested Mathis to assist in resolving the matter, Mathis responded that she did not have time to handle his problem. The contractor then requested Pastro's help, whereupon Pastro interceded and concluded the negotiations. Upon learning of this development, Mathis allegedly called the contracting officer and berated him for 15 minutes for "going over her head and making her look

17. These employees, according to Mathis, refused to perform work and would not accept her as their supervisor.

18. In February 1995, Mathis had a conversation with William Cochrane, the new Regional Area Manager. Cochrane mentioned that Mathis' ratings had fallen under Hay and that Hay was a "micro manager." Mathis replied in a manner which suggested that her low ratings were not due to Hay's tendency to micro-manage, but that they were the byproduct of discrimination, which is why she filed an EEO complaint. Mathis Aff. ¶ 15.

19. After a period of abusive treatment, says the defendant, one of the subordinates, Barber, left. Mathis continued to berate Cramer. Mathis then went into Barber's office, approached Barber, shaking her finger, and repeating her earlier remarks, calling Barber arrogant, cocky, unprofessional, and lazy. Barber and Cramer complained to Pastro. DEX 20.

20. Mathis says that she told Cramer and Barber that they should have informed her that they were going to the Branch Office and that they had not recorded their time correctly in respect of that visit. Before Mathis finished speaking, Barber allegedly stated that she was not going to listen to Mathis and stormed out of the office. Mathis then requested Cramer to close the door and asked Cramer why she had told Pastro that

Mathis wanted her off her team. Cramer insisted that Mathis had made that statement at a meeting. Mathis reminded Cramer that she did not want anyone leaving because they had too much work. Mathis then expressed the view that Cramer's true motivation for leaving was to escape from an assignment which required Cramer to work from a different building. Mathis then told Cramer to change her time sheet to properly record the time spent conferring with Pastro.

According to Mathis, she then went to Barber's office to tell her to "stop acting up, that just because she was leaving, did not mean that she could act up that way." Barber reportedly responded: "I'll leave right now if that is what you want." Other exchanges ensued about a pre-departure security check-out. When Mathis called Pastro to inform him about her confrontation with Barber, Pastro advised that he had heard the opposite from Barber and a neutral party and that he was "informing personnel." Mathis Aff. ¶ 17.

21. Islam Jawahar allegedly performed Barber's exit security check on the day that Mathis exchanged words with Barber and Cramer.

22. Mathis claims that she simply called Jawahar Islam to remind her that it was too early to perform the security check and that she did not raise her voice in so doing. Mathis Aff. ¶ 17.

bad." This abuse was also reported to Pastro. DEX 20.

On February 27, 1995, in response to these complaints, Pastro met with Mathis' staff, who requested a change in office environment and reported that they were looking elsewhere for employment. DEX 19. Apparently, even before the February incidents, the Regional Audit Manager, Cochrane, had been observing Mathis after receiving reports of other incidents which concerned him. DEX 28, p. 7–9. Also on February 27, Mathis contacted an EEO counselor, alleging that her supervisor had threatened her with a personnel action. DEX 22.

On or about March 21, 1995, Cochrane and Pastro met with Mathis to discuss the allegations against her and to inform her that she was to be temporarily detailed to DCAA's Fairfax Branch for 120 days in a non-supervisory position at the same pay grade and salary. DEX 28 at 32; DEX 19. Cochrane made this decision to ensure that Reston Branch Office employees could freely cooperate in the investigation of Mathis without fear of retribution. DEX 28 at 26–28. According to Cochrane, this approach had been followed in previous investigations at the DCAA. DEX 28 at 25–26. Mathis claims that this temporary reassignment was discriminatory.

On or about June 9, 1995, Mathis was informed by memorandum that Cochrane intended to propose her suspension for five days without pay, the maximum punishment for conduct unbecoming a supervisor.[23] DEX 20. Mathis also was instructed that she could not speak to other employees in the Reston Branch Office about these charges, a directive which Mathis alleges was discriminatory and impeded her ability to present a defense. Mathis Aff. ¶ 19. Mathis, however, was able to submit a 60 page response, which included letters from individuals.

**23.** Cochrane recommended the suspension after the investigation had been completed. The memorandum set forth the reasons for the proposed suspension, including: Mathis' altercations with Barber, Cramer, and Islam Jawahar; Mathis' alleged abusiveness toward CSC contractor personnel; previous complaints of Mathis'

On August 24, 1995, Willard F. Weikel, Deputy Regional Director, advised Mathis that, having considered her case, he had decided to suspend her from duty without pay for five calendar days. Weikel's decision was based on the allegations of eight individuals, including auditors on Mathis' team, auditors not under Mathis' supervision, a fellow supervisor and a contractor vice president. DEX 23. Weikel also considered Mathis' response. In part, he concluded:

> Your individual responses ... represent more than mere rebuttals to the events they allege took place; they are, quite frankly, scathing indictments of their character, behavior, and motivations. At various places in your lengthy reply, you made the following characterizations: that Cramer and Barber were problem employees, unwilling workers, hostile toward other team members and not liked or trusted; that auditors Barber, Chiarenza, Cramer, Supervisor Fellows, Branch Manager Pastro, and Contractor VP Baker were all hostile toward and disrespectful of you. You also labeled Chiarenza insubordinate toward you ... Put simply, it is your position that all of these people are the cause of the problems described in the proposal, not you.

>     *    *    *    *    *    *

> I find that eight individuals provided statements which, to varying degrees, support a conclusion that your behavior as a supervisory auditor is inappropriate and unprofessional. Four of those individuals are, or were auditors on your team, two were auditors not under your supervision, one was a fellow supervisor, and one a contractor vice president.

DEX 23. Weikel further concluded that the charges alleged as the basis of the suspension proposed by Cochrane were supported by a preponderance of the evidence, explaining that:

> unprofessional behavior; and Mathis' verbal response to the allegations at the meeting between her, Pastro and Cochrane in March. Mathis was given seven calendar days to reply; was informed of her right to an attorney and also of the availability of services from the Employment Assistance Program.

It is very difficult for any reasonable person to dismiss the credibility of all these statements, accepting only your version of the events as credible. Even though you have provided statements of support from three other employees, the statements of the other eight people represent overwhelming evidence of serious problems in your approach to effective working relationships. It has been my experience that it is normally difficult to persuade even one or two employees to provide statements to higher level management regarding serious problems with their supervisors, for fear of reprisals if things don't change. It has also been my experience that a few employees will always side with the supervisor who is the subject of allegations by others, usually based on their particular relationship with that individual.

*Id.* Weikel also remarked that he had acted as the deciding official in many disciplinary actions and that Mathis' reply to the charges against her went well beyond the usual level of anger, particularly in her personal attacks of the character and integrity of those who had submitted evidentiary statements and also of Cochrane and Pastro. Finally, Weikel found it disturbing that Mathis refused to concede that her own behavior played any part in the obvious problems in the relationship between her and her co-workers. On September 11, 1995, Mathis was placed on a five day suspension. DEX 24.

## DISCUSSION

### I. The Claims Asserted By Mathis

Because of confusion over the claims alleged in the Complaint, clarification is in order. Based upon the papers filed and the arguments of counsel, the Complaint has been construed as alleging the following claims, which will be discussed accordingly: (1) Hay allegedly discriminated and retaliated against Mathis by issuing her "sub-par" performance evaluations (Complaint at ¶ 14, ¶ 29; Plaintiff's Response at 17); (2) Pastro and Cochrane allegedly discriminated and retaliated against Mathis by detailing her, suspending her for five days based on pretextual charges, and by threatening her with discipline if she sought to talk to employees who may be witnesses for her (Complaint ¶ 29, Plaintiff's Response at p. 25); and (3) Hay, Pastro and Cochrane subjected Mathis to a hostile work environment. Complaint at ¶ 28.

Defendant moved to dismiss Mathis' claim that Hay's issuance of "sub-par" performance evaluations constituted discrimination and retaliation, contending that such conduct does not constitute "adverse employment action" and cannot be considered discrimination or retaliation as a matter of law.[24] The Court declines to address this issue, because, even assuming that Hay's evaluations of Mathis, which ranked her in the low range of the "fully successful" category, constitute "sub-par evaluations", and even assuming that these "sub-par evaluations" are "adverse employment actions," Mathis' claims fail under familiar summary judgment principles. There is thus no need to consider whether those claims fail as a matter of law.

### II. Summary Judgment Principles

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, the court is not to weigh

---

**24.** The defendant originally construed the Complaint as alleging, in part, that each of the allegations lodged against Hay in Mathis' first EEO complaint and accepted for investigation on July 29, 1994, (Hay required Mathis to work at the Capital Branch Office rather than at the suboffice; Hay drafted memorandum which criticized Mathis' work performance; and Hay issued Mathis sub-par evaluations) constituted discrete acts of discrimination and retaliation. Based upon that assumption, defendant moved to dismiss such claims, alleging that none constituted an "adverse employment action." Mathis responded by arguing that defendant had misconstrued her Complaint because, with the exception of Hay's issuance of sub-par evaluations, Hay's conduct was not alleged as discrete acts of discrimination, but instead evidenced a hostile work environment claim (based upon race and sex) and served as background evidence of discrimination and retaliation against Mathis. Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 17. Therefore, only Hay's issuance of so-called, sub-par evaluations is subject to the defendant's motion to dismiss.

the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion:" and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,'" that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *see also Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334 (4th Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)); *see also Catawba Indian Tribe*, 978 F.2d 1334.

In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Rather, that party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita*, 475 U.S. at 587; *see also Anderson*, 477 U.S. at 249.

### III. The Legal Framework

In proving her Title VII claims, Mathis may rely upon direct evidence of her employer's intent to discriminate or on cumulative indirect evidence of her employer's motivation. *Ballinger v. North Carolina Agri. Ext. Svc.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). Yet, because subjective intent and motivation are so difficult to prove, Mathis may rely upon the proof scheme created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Pursuant to *McDonnell Douglas,* Mathis must first establish a prima facie case by a preponderance of the evidence, thus creating a rebuttable presumption of discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If Mathis succeeds, the burden then shifts to defendant to rebut "the presumption by producing evidence that its actions were based upon legitimate non-discriminatory reasons." *Id.* at 255. Defendant is not required to prove the absence of discriminatory motive, but merely to articulate some legitimate reason for its action.

If defendant carries its burden of production, the presumption in favor of Mathis is destroyed. *Id.* at 255. The "prima facie case 'drops out of the picture' and the burden shifts back to [Mathis] to show that the given reason was just a pretext for discrimination." *Evans v. Technologies Applications and Service Co.,* 80 F.3d 954, 959 (4th Cir.1996) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). To satisfy her burden of showing pretext, Mathis "must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington College,* 57 F.3d 369 (4th Cir.), *cert. denied,* 516 U.S. 944, 116 S.Ct. 380, 133 L.Ed.2d 304 (1995) (citing *St. Mary's Honor Ctr.,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407). Of course, Mathis "always bears the ultimate burden of proving that the [defendant] intentionally discriminated against her." *Evans,* 80 F.3d at 959 (citing *Burdine,* 450 U.S. at 253). It is against this background that each of Mathis' claims must be assessed.

### A. Discrimination—Capital Branch Office

Mathis claims that Hay's issuance of two "sub-par" evaluations constitutes discrete acts of discrimination. Because Mathis is a federal employee, she brings this action pursuant to 42 U.S.C. § 2000e–16, which provides; "All personnel actions affecting employees ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." In order to show her prima facie case of discrimination, then, Mathis must show that: (1) she is a member of a protected group; (2) she was affected by an adverse personnel action; and (3) the action gives rise to an inference of unlawful discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also, Saunders v. Stone*, 758 F.Supp. 1143, 1146–47 (E.D.Va.) (plaintiff must show: (1) employment by defendant; (2) membership in a protected class; and (3) differential treatment from persons outside the protected class in a manner that creates an inference of discrimination), *aff'd*, 948 F.2d 1282 (4th Cir.1991).

Mathis is a member of a protected class. And, the Court assumes for purposes of this motion that Hay's so-called, sub-par evaluations of Mathis constitute "adverse personnel actions." [25] Nevertheless, Mathis has failed to prove her prima facie case because she failed to show that Hay's evaluation decisions were made under circumstances giving rise to an inference of unlawful gender or racial discrimination.

■ Mathis claims that Hay's deposition testimony provides the evidence she needs to show that Hay was motivated by discrimination in issuing her evaluation. Mathis is incorrect. Although Mathis accurately recounts that Hay admittedly gave her a lower evaluation score than he gave two white males, Steve Tashjian [26] and George Bedros,[27] Mathis omits the undisputed fact that Hay gave a black female supervisory auditor, Joan Harriston–Smith, the highest, or at least one of the two highest, ratings of all supervisory auditors rated by Hay.[28] *See* DEX 26, p. 29.[29] Therefore, there is no evidence in the record by which a jury could conclude that Hay considered race and gen-

**25.** The record contains no evidence that Mathis suffered provable economic harm from the evaluations. Although Mathis has alleged that the sub-par evaluations caused her to lose awards and bonuses, the exhibit she offered in support of this contention demonstrates that none of the supervisory auditors, who were given higher evaluation scores by Hay, received awards or evaluations. Thus, one can only speculate that Mathis' unfavorable evaluation caused her economic disadvantage. On the other hand, providing Mathis every reasonable inference to which she is entitled, the record reflects that the allegedly unfavorable evaluations remain in Mathis' personnel files. Therefore, if, as Mathis has claimed, her 1993 and 1994 performance evaluations ranked her lower than she deserved only because of her gender and race, she would still be at risk of suffering unwarranted injury to her reputation and loss of promotion. *See* 5 C.F.R. §§ 293.404–05 (performance ratings remain in an employee's files for four years, after which they must be purged and destroyed); 5 C.F.R. § 351.504 (the employee's three most recent annual ratings of record from the four year retention period are used to calculate reduction in force credits for performance). Therefore, if Mathis were to succeed on her claims, she could be entitled to having her files purged as a remedy. *See Smith v. Secretary of the Navy*, 659 F.2d 1113, 1122 and n. 57 (D.C.Cir.1981) (although

employee suffered no financial loss from improper evaluation, unfavorable assessment reviewed in connection with future decisions could prejudice superiors and diminish chance for advancement; remedy is to restore employee to position he would have been but for the discriminatory offense).

**26.** The parties also spelled "Tashjian" as "Tashijian".

**27.** George Bedros, according to Mathis was "Ethiopian or some other race that's considered white." Mathis Dep., DEX 25 at 21.

**28.** Hay recalled that Joan Harriston–Smith received an evaluation score in the approximate range of 210 to 225; Joseph Watkins, a black male, received an evaluation score in the approximate range of 205 to 215; and George Bedros received an approximate score of 210. *See* DEX 26 at 29; DEX 25 at 21.

**29.** Steven Tashjian, special assistant to Hay, received an evaluation score which was between 250 to 260, a higher score than Joan Harriston–Smith received. Hay Dep. at 29. However, Tashjian was not a supervisory auditor, as were Mathis and Harriston–Smith, and therefore, is not similarly situated. *Id.*

der in the decision making process at issue here.[30]

■ Mathis contends, however, that she need not rely upon inferences of gender or racial discrimination under the *McDonnell Douglas* method because there exists direct evidence of discrimination. This is simply not the case. Mathis has recited no evidence whatsoever of *racial* discrimination. And the only direct evidence of *gender* discrimination is the trivial, isolated, inoffensive comments allegedly made to Mathis by Hay, such as "keep your skirt on" and "stop your bitching." Hay also allegedly ignored Mathis' comments and concerns and complimented her hairstyle and dress. However, Hay also testified that he similarly complimented men when they looked nice. Hay Dep. at 38. Finally, the other inconsequential comments made by Hay, in the context of this case, "fail to provide direct evidence of a purpose to discriminate or raise circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact." *Evans,* 80 F.3d at 959.

Mathis says that the evidence of sexist comments she presented "is enough in itself to get plaintiff past her *prima facie* burden on the sex discrimination issue." Mathis Opposition to Defendant's Motion for Summary Judgment at 19. The Court disagrees because the phrases on which Mathis relies for proof of discrimination are not discriminatory, at least, in the context of their utterance here. The term "keep your skirt on" is a slight variant of the phrase "keep your shirt on", which simply means to remain calm and refrain from confrontation (taking one's shirt off was a prelude to fisticuffs). The phrase has no cognizable derogatory gender connotations merely because it is spoken to a female or refers to a piece of female apparel.

The root word of "bitching" is "bitch" which connotes a female canine. *Webster's Third New International Dictionary* at 222 (1986). However, over the years, the word "bitching" has taken on a number of non-gender related meanings. For example, it is often used as a synonym for complaining or carping. *Id.* ("slang: complaint, grumbling"). It is also used colloquially to mean very difficult or very good. *Id.* ("slang: something regarded as outstanding of its kind esp. in unpleasantness"); *see also* Tony Thorpe, *The Dictionary of Contemporary Slang* at 41 (1990) ("something impressive, admirable ..."). The root word, "bitch", itself has been used to connote difficulty. *Webster's Third New International Dictionary,* at 222; *see also* Tony Thorpe, *The Dictionary of Contemporary Slang* at 41 ("an infuriating or gruelling task"). Thus, today, neither the words "bitch" nor "bitching" carry a gender based or gender biased meaning *per se.* Rather, one must look to the context of articulation to discern meaning. Here, the record shows that the use of the word "bitching" by Hay was a synonym for complaining. Mathis does not suggest otherwise.

For better or for worse (generally worse), the use of language today has fallen victim to informality and colloquial meaning. Hence, courts must be careful to consider words in the context of use before ascribing actionable consequences to them. The two phrases on which Mathis has relied are not actionable when placed in the context of their use.

■ Mathis claims, however, that Hay also made offensive, gender-based comments to another employee, Latrese Brown. And, the affidavit submitted by Latrese Brown an Mathis' behalf contains allegations that statements of sexual innuendo, or worse, were made by Hay to Latrese Brown.[31] Whatever

---

**30.** Mathis admits that Hay gave all the supervisory auditors, whom he evaluated, the identical score in both the 1993 performance evaluations and the 1994 exit ratings. Therefore, the same reasoning applies to both of the so called sub-par evaluations complained of by Mathis.

**31.** Brown said that Hay made "sexist comments" to her, including that she "should not yawn in front of him because it made him want to go to sleep on top of [her];" that when she and Hay

were pushing carts into an elevator, Brown suggested that she would sit on the cart so Hay could push her, and that Hay responded, "he wasn't going to tell [her] what [she] could sit on"; Hay also said that Brown looked real tired ant that it "was on account of [her] having just got married." Brown did not say that similar comments were made to Mathis; instead, Brown attested only that Hay repeatedly talked negatively about Mathis in front of staff, implying that Mathis was not doing her job. Brown Aff, PEX.

claim Brown may have is not before this Court. Nonetheless, assuming that Hay made these offensive comments to Latrese Brown, they "are not indicative of any intention by [Hay] to make any decision in any manner unfavorable to women generally or to Mathis in particular." *Green v. Fairfax County School Board,* 832 F.Supp. 1032, 1039 (E.D.Va.1993), *aff'd* 23 F.3d 400 (4th Cir. 1994). In other words, Hay's comments to Brown are "stray remarks, unrelated to the decision making process at issue [the evaluation process] and are not evidence of discrimination." *Id.* (citations omitted). Taken in context, they evince, not a gender-based bias, but a prurient interest in Brown, individually.

■ Even if the Court were to assume that the comments which Hay made to Latrese Brown could support an inference of discrimination in the evaluation process, and if the Court were further to assume that Mathis has made a prima facie case of discrimination, the defendant has rebutted the presumption which would arise in favor of Mathis by producing evidence that Hay gave to Mathis the allegedly "sub-par evaluations" for legitimate, non-discriminatory reasons.

In his deposition, Hay testified that Mathis' performance warranted a lower score than the "fully successful" rating he actually gave her. Hay claims that he gave Mathis the higher score for two reasons: first, he believed Mathis had potential to become a good supervisor; and second, he wanted to prevent Mathis from being subjected to an employment performance improvement period,[32] Moreover, in explaining Mathis' evaluation score, Hay testified to the basis for his score, category-by-category. Hay Dep., DEX 26 at 30–33 (testifying about DEX 14).

For instance, Hay testified that, although he gave Mathis a fully successful rating for the timely accomplishment of plans, he could have rated her "minimally successful" in that category because more than half of her demand type assignments were late. Hay Dep. at 30. Further support for Hay's rating in

this category is found in the memoranda he sent to Mathis and the ones he drafted to files. In particular, the memoranda dated May 6, 1993 and August 18, 1993 detailed which of Mathis' reports Hay claimed were overdue. DEX 3, DEX 7; DEX 9.

Hay also explained why he rated Mathis fully successful in the category, "establishing and maintaining working relationships inside and outside DCAA." As Hay recalled, about one week after he arrived, (presumably as manager of the Capital Branch Office), a contractor and that contractor's lawyer complained that Mathis had called the contractor a crook to a third party. On another occasion, Hay recalled that a comptroller for a very large contractor complained that, while under Mathis' supervision, the office had given out information on his company, causing the contractor to lose a large contract. Hay explained that he did not include these particular complaints in Mathis' evaluation because he wished to give Mathis the benefit of the doubt and the opportunity to improve. Hay Dep. at 32–33. Finally, Hay said that in his exit evaluation of Mathis, he rated her for a category in which he had not observed her because he believed that under that circumstance, the policy was to give an employee a fully successful rating (a score of "one"). Hay Dep. at 26.

These reasons provide legitimate explanations for the decision of Hay to give Mathis a score which fell at the low end of the fully successful range. *See Evans,* 80 F.3d at 960 ("job performance ... [is] widely recognized as [a] valid, nondiscriminatory base[ ] for any adverse employment decision") (citations omitted). Therefore, the defendant has satisfied its burden of production and has rebutted the presumption created in Mathis' favor. Mathis, however, failed to show that these rationales were pretextual.

■ In order to satisfy her burden of showing a pretext, Mathis "must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged

---

**32.** According to Pastro's deposition, employees with performance problems are supposed to be placed on a performance improvement program. Such employees must be told in writing what critical element they are failing and what they

must do to improve. Employees are then given 60 to 90 days, and if they do not perform satisfactory within the time frame, they are subject to dismissal. Pastro Dep. at 17–20.

conduct." *Jiminez v. Mary Washington College*, 57 F.3d 369 (4th Cir.), *cert. denied*, 516 U.S. 944, 116 S.Ct. 380, 133 L.Ed.2d 304 (1995) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Here, Mathis has sought to meet her burden by arguing (without any support other than her affidavit) that she was either timely in submitting reports, or that she was justified in failing to meet deadlines because she had been waiting to receive necessary information from contractors. Mathis Aff. at 3, 5–6, ¶ 9. Mathis also claims that Hay's assertion, that he gave Mathis a higher rating then was warranted, is self-serving. Finally, Mathis complains that, in his exit rating of her, Hay rated Mathis for a category in which no work had been performed.[33] Mathis Aff. at 7, ¶ 14.

Even if these explanations are found to raise a triable issue of fact respecting whether Mathis' evaluations were sub-par for the reasons stated by Hay, that would give rise only to a question of whether Hay's proffered explanations are false. That, of course, is insufficient to carry the burden on Mathis to show that the reason was a "pretext", which means "pretext for discrimination," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515–516, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). This is so because Mathis has provided no evidence to raise a triable issue respecting whether discrimination, as opposed to personal animosity, provided the true reason for her low evaluations. Therefore, Mathis has not shown that the question of pretext should be sent to a jury.[34]

33. Mathis also attempted to rebut the legitimate reasons Hay proffered to justify his ordering Mathis to work out of the Capital Branch Office and his denial of her requested credit hours. However, as discussed above, Mathis has not asserted these complaints as discrete acts of discrimination. Therefore, they are not at issue here.

34. Of course, "the fact-finders rejection of the legitimate, nondiscriminatory reason proffered by the defendant, coupled with the elements of the prima facie case, may permit the fact-finder to infer the ultimate fact of invidious discrimination with no additional proof of discrimination." *Jiminez*, 57 F.3d at 378 (citing *St. Mary's*, 113 S.Ct. at 2753). Here, however, no reasonable juror could infer discrimination under that para-

In conclusion, defendant is granted summary judgment on Mathis' claim that Hay discriminated against her by issuing an evaluation, which rated her at the low end of the fully successful range.

### B. Retaliation—Capital Branch Office

Mathis also claims that Hay's decision to rate her performance at the low end of the fully successful range was motivated by his desire to retaliate against her for initiating the EEO process on August 19, 1993. "To establish a prima facie case of retaliation, [Mathis] must show that (1) [s]he engaged in protected activity; (2) [her] employer took adverse employment action against [her]; and (3) a sufficient causal connection existed between [her] protected activity and [her] employer's adverse employment action." *Hopkins v. Baltimore Gas and Electric Co.*, 77 F.3d 745, 754 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996) (citations omitted).

Mathis' initiation of the EEO process constitutes protected activity, and the Court has assumed for purposes of this motion that the sub-par evaluations were adverse employment actions. However, Mathis has not shown a causal connection between her protected activity and Hay's adverse employment action.

Mathis contends that she has shown the requisite causal connection by demonstrating temporal proximity between Hay's discovery of Mathis' EEO activities, at some unknown date in September 1993, and Hay's issuance of one of Mathis' sub-par evaluations in the beginning of October 1993.[35] Mathis claims

digm because no evidence of discrimination in Hay's evaluation process has been shown (as demonstrated by Hay's rating of Joan Harriston–Smith, an African American female, the highest of all supervisory auditors), and also because Mathis herself admitted that Hay was not as hostile to the other supervisory auditors, including Joan Harriston–Smith, as he allegedly was to Mathis. DEX 25, Mathis Dep. at 22.

35. Mathis first commenced her EEO complaint respecting Hay's conduct in the Capital Branch Office in August 1993 when she contacted an EEO counselor and began an informal complaint process. She filed the formal complaint January 18, 1994. Mathis Decl. to Plaintiff's Motion in Opposition to Defendant's Motion to Dismiss filed September 25, 1996.

that temporal proximity alone is sufficient to meet her prima facie case, relying on *Kralowec v. Prince George's County,* 503 F.Supp. 985, 1010 (1980) ("absent other evidence tending to establish a retaliatory motivation, a plaintiff may meet his burden by showing that an adverse action followed her protected activities within such a period of time that the Court could infer retaliatory motivation."), *aff'd,* 679 F.2d 883 (4th Cir.), *cert. denied,* 459 U.S. 872, 103 S.Ct. 159, 74 L.Ed.2d 132 (1982).

In the alternative, Mathis recounts several other facts which, in her view, support a finding of retaliation by Hay. First, Mathis says that Hay treated her different than he treated the other supervisory auditors, as evidenced by Hay's giving her the lowest evaluation score. However, Mathis offered no facts to support a finding that other supervisory auditors shared her record of performance and record of poor employee and clientele relations.[36] Second, Mathis claims that Hay informed her that he would "get back at her" for complaining to his supervisor. This allegation, although set forth in the pleading which Mathis filed in opposition to defendant's motion, was not contained in Mathis affidavit. Rather, Mathis' affidavit states only that, when Mathis raised the issue of Hay's requiring her to move back to the Capital Branch Office with Hay's supervisor, Hay responded that "this issue was 'not over as far as he was concerned.'" That statement hardly can be ascribed the meaning Mathis has given it in her pleading.

Third, Mathis says that she was the only supervisory auditor whom Hay required to work out of the Capital Branch Office. Yet, the undisputed record is that Mathis was the only auditor to have moved her office from the Capital Branch Office to a suboffice.[37] Finally, Mathis' papers assert that another person, who filed an EEO complaint against Hay, Leander Brown, received two unsatis-factory ratings from Hay. However, the record contains no evidence respecting Brown's EEO complaint, including whether it was filed before or after the evaluations. Thus, the only record evidence Mathis has shown to prove her prima facie case of retaliation is temporal proximity.

The Court finds that, under the facts presented here, where no other evidence supports a finding of retaliatory motive, the temporal proximity between discovery of Mathis' EEO complaint and Hay's issuance of her sub-par evaluation is insufficient to show a causal connection. *See Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (finding that plaintiff's discharge four months after filing discrimination claim did not support inference of retaliation); *Verbanic v. Veco, Inc.,* 927 F.2d 612 (9th Cir. 1991) (in case involving alleged retaliatory discharge for filing of worker's compensation claim, finding that, given lack of other evidence of retaliation, proximity of five or six weeks did not justify inference of retaliation); *c.f. Mize v. Jefferson City Board of Education,* 93 F.3d 739 (11th Cir.1996) (in case involving alleged retaliatory discharge for comments made by teacher, finding that, although it is usually reasonable to infer that when termination closely follows protected activity, the activity was the cause of the adverse employment decision, it is not true in every case; rather, it must be reasonable to assume that the employer had cause to retaliate). In this action, the record shows, by contemporaneous documentary evidence, that Hay found fault with Brown's work and performance as early as May 1993, long before Mathis lodged an EEO complaint. The record demonstrates also that from May until December, Hay pointed out numerous deficiencies in Mathis' performance. Thus, long before the alleged act of retaliation, Hay recorded dissatisfaction of the kind and quantity which would warrant the reduced

---

36. Statements by DCAA employees to the EEO counselor, investigating Mathis' complaint, indicate that more work was given to Mathis and Harriston–Smith than was given to the male supervisors because the two females were more competent. However, the statements also detail Mathis problem in dealing with coworkers. DEX 1 at p. 8–16.

37. Mathis herself admitted that she didn't stay at the Capital Branch Office "every day like [the other supervisors] did", although she "was in and out" and went to the Branch Office at least two to three times per week. DEX 25, Mathis Dep. at 26.

evaluation score. Therefore, Mathis has not shown her prima facie case.

Assuming, however, that Mathis has proved her prima facie case, her retaliation claim fails because defendant offered legitimate reasons for issuing Mathis a low evaluation (as detailed in the foregoing section, denying Mathis' discrimination claim). Those reasons destroy the presumption created in Mathis' favor, which Mathis cannot rebut by a showing of pretext. In order to show "pretext", Mathis bears the "ultimate burden of showing . . . that [her contact with the EEO officer] was 'the motivating part' in the decision" to issue Mathis' sub-par evaluation. *See McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991).

Mathis has not shown that Hay's post-evaluation rationalizations of Mathis' scores are pretextual for retaliation because Hay's dissatisfaction with Mathis' performance was thoroughly documented in numerous memorandum of record well before Mathis' first contact with the EEO on August 19, 1993.[38] Thus, even if Mathis could show that Hay lied in his various memoranda concerning his dissatisfaction with her performance, the disputed facts are not material because the memoranda *predate* Mathis' initiation of EEO activities. Thus, any possible motive that Hay may have had to fabricate the allegations contained in his memoranda about Mathis' poor performance could not be retaliatory; Mathis' EEO activities had yet to

occur.[39] Therefore, Mathis' retaliation claim must fail.

## C. Disparate Disciplinary Treatment— Reston Branch Office

Although ambiguous in the Complaint, in their papers, both the defendant and Mathis treated Mathis' discrimination claim respecting the Reston Branch Office as a disparate disciplinary treatment issue. Two disciplinary acts form the basis of Mathis' claims: (i) she was detailed to a non-supervisory position during the investigation of complaints against her; and (ii) she was suspended for five days for inappropriate conduct pursuant to alleged discriminatory procedures.[40] See Complaint at 10, ¶ 29.

"To establish a prima facie case of racial discrimination in the enforcement of employee disciplinary measures under Title VII, the plaintiff must show: (1) that [s]he is a member of the class protected by Title VII, (2) that the prohibited conduct in which [s]he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against [her] were more severe than those enforced against those other employees." *Cook v. CSX Transportation Corporation*, 988 F.2d 507 (4th Cir.1993) (citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985)).

---

**38.** On May 6, 1993, Hay presented two memoranda to Mathis The first memorandum, entitled "Observations of My First 30 Days," noted numerous problems with Mathis' performance. The second memorandum, also dated May 6, advised Mathis that Hay expected her to perform her duties at the Capital Branch Office; it further said that the department would accommodate Mathis' allergy sensitivities by assigning her to a different room within the Capital Branch Office. (DEX 3, 5). On June 17, 1993, Hay reminded Mathis that her requirements plan was long overdue and requested that she bring it personally to his office. (DEX 6). On August 18, 1993, Hay sent Mathis a memorandum which informed her that the landlord of the building had taken steps to alleviate her allergy problems and there was thus no need for her to continue to work outside the office. (DEX 8). Finally, Hay sent Mathis a second memorandum on August 18, 1993 detailing a list of five items that were overdue. (DEX 7).

**39.** The undisputed facts bespeak the existence of a personal conflict between Mathis and Hay. It appears that this retaliation was precipitated largely by Mathis' insubordination and her desire to set her own work terms, a notion which neither Hay, nor any reasonable employer, could tolerate. But, even if Hay was motivated by ill will in issuing Mathis' evaluations, his actions may not be commendable, but they also are not actionable under Title VII. Title VII is not a tool for vindicating personnel discord.

**40.** Mathis commenced her second EEO complaint on February 27, 1995 when she contacted an EEO counselor and began an informal complaint process. The formal complaint was filed June 13, 1995. Mathis commenced a third informal complaint (the second respecting actions taken against her at the Reston Branch Office) on November 30, 1995.

Mathis has failed to prove a prima facie case of discriminatory disciplinary treatment because she failed to show that the prohibited conduct in which she engaged was comparable in seriousness to the misconduct of employees outside the protected class. She also failed to demonstrate that the disciplinary measures enforced against her were more severe than those enforced against other similarly situated employees.

Mathis summarily recounts four instances in which white and/or male employees allegedly yelled at other employees and were punished to a lesser degree than she was. First, Mathis alleged that her supervisor, Pastro, a caucasian male, had repeatedly lost his temper, screamed and swore at his employees. Yet, Mathis failed to provide a basis with which to compare Pastro's actions with the actions she took. Mathis failed to show over how long a period of time Pastro's misbehavior occurred (i.e. did three incidents occur over a period of twenty years); whether the incidents involved short outbursts or sustained beratements; and, most importantly, whether Pastro's behavior was brought to the attention of his superiors, and if so, whether he was punished. Indeed, the affidavits Mathis provided in support of her claim, are either silent about whether Pastro was punished, (Latrese Brown Aff.), or assert a "belief" that Pastro was not disciplined (except that the employee knew that Pastro was not reassigned) Linear Cherry Aff.

Mathis also compares her situation to that of another coworker. In particular, she says that Charlotte Johnson was screamed at by several male supervisors, including Joe Watkins, a black male. According to Johnson's affidavit, she and "Joe Watkins ... on several occasions had heated arguments." Although one of these heated exchanges was brought to Pastro's attention, Pastro orally admonished Johnson but did not reprimand Watkins.

Finally, Mathis relates two accounts of male employees who had lost their temper and exhibited allegedly inappropriate behavior. Both of these employees, however, were Mathis' subordinates and, are not similarly situated to Mathis.[41] Hence, any differential treatment does not raise an inference of discrimination. Assuming, however, that Mathis' subordinates may be considered similarly situated to her, at least one of them was suspended for at least the same time, or for a longer period of time, than was Mathis.[42] As to the other subordinate, Frisicaro, the evidence fails to provide an adequate basis for comparison because it suggests only that, during a quarrel over a "prized office," the subordinate told Mathis that he was going to report her and also that he was going to watch her. Mathis Aff. at ¶ 16. This allegation simply does not compare with the repeated, sustained, haranguing of subordinates, co-workers, and a contractor of which Mathis was accused.[43]

41. It is natural to assume that a person holding a managerial position, such as Mathis, would be held to a higher standard of conduct than would her subordinates, who hold non-managerial positions.

42. There is some confusion in the record as to the amount of time that the subordinate, Gregg Stuvee, was suspended. *See* Pastro Dep. at 20–23. Pastro at first stated that he gave Stuvee a written reprimand for calling a supervisor a pejorative name. Pastro then indicated that Stuvee was reprimanded for misuse of a credit card. Pastro later clarified that he gave Stuvee a suspension for five days for misuse of the credit card; and that he also gave Stuvee a ten day suspension for calling the supervisor a name. Pastro Dep. at 23. In another incident, of which Mathis complains, Stuvee told Mathis she was incompetent. Pastro testified that: (1) he got Mathis and Stuvee together, (2) Stuvee apolo-

gized; and (3) Mathis said that she accepted the apology. Pastro also said that Stuvee was transferred from Mathis' team and that Mathis told Pastro there was no need to proceed with further disciplinary measures. Pastro Dep. at 15–16.

43. Mathis claims that contrary to the allegations asserted against her, she acted rationally, calmly, and respectfully during the incidents for which she was punished. However, Mathis did not claim that the defendant misrepresented the nature of the *allegations* lodged against her which were part of the record considered by the defendant in suspending Mathis. Therefore, although the Court cannot resolve factual disputes at the summary judgment stage, here, the issue is whether, in perspective of the *allegations*, Mathis' punishment was more severe than those enforced against other employees who were charged with similar offenses based on similar allegations.

Of course, comparisons between employees "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook*, 988 F.2d at 511. Yet, the undisputed evidence shows that people in the defendant's establishment who lost their temper either were or were not punished for their misconduct. Where punishment was doled out, the punishments ranged from an apology to a ten day suspension.[44] Moreover, according to Cochrane's deposition, which was not disputed, at least two supervisors besides Mathis had been detailed to other positions during an investigation, as was the case with Mathis. DEX 28 at 25–26; *see also* DEX 23 at 4.

In sum, Mathis' five day suspension and detail fell within the range of punishments meted by the defendant. Besides, even if Mathis was punished to a greater extent than other employees who engaged in similar behavior, a conclusion impossible to draw from the facts on this record, Mathis has failed to show that the conduct of those who were not disciplined, except Watkins and Frisicaro, was ever reported to a supervisor or management. Hence, Mathis has not proved her prima facie case of disparate disciplinary treatment.

▪ Even assuming that Mathis successfully proved her prima facie case, defendant has shown legitimate reasons for Mathis' detail and suspension, and Mathis' claim fails because she has not shown that the defen-

dant's reasons were pretextual. First, defendant asserted that Mathis' detail was necessary to ensure that the complaints lodged against her could be investigated without her subordinates and other staff fearing harassment or retaliation. Given the nature of the charges against Mathis, even if, in retrospect, defendant incorrectly ordered the detail, its fear of harassment by Mathis were reasonable at the time.[45]

Second, the decision to suspend Mathis was made by a neutral party, Willard F. Weikel, Deputy Regional Director, whom Mathis has not claimed to harbor discriminatory intent. This demonstrates that the decision to suspend was made on the basis of Mathis' inappropriate conduct, rather than her race or gender. Mathis argues, however, that Weikel's consideration was tainted by the very men who she claims to have discriminated against her, Pastro and Cochrane.

That argument lacks merit. Weikel considered not only Pastro and Cochrane's statements, but also the allegations made by auditors on Mathis' staff (several of whom were female), auditors not under Mathis' supervision, a fellow supervisor, and a contractor vice president.[46] In addition, Weikel considered *Mathis' sixty page reply*, which he found to exhibit a level of anger well beyond that displayed in the usual reply, including personal attacks on the character and integrity of those who had submitted statements. Thus, Mathis has failed to show that Weikel's decision to suspend her was pretextual.[47]

**44.** Under the guidelines, a first offense of minor disorderly conduct is punishable by a range of oral admonishment to a 5–day suspension; second offenses are punishable by a range of reprimand to a 10–day suspension. PEX 14.

**45.** Mathis alleges that the detail was unnecessary because the investigation had been completed before the detail occurred. This contention has no merit. Mathis was detailed on March 22, 1995. The investigation against her was not concluded until June 1995. The record does reflect, however, that Pastro had taken statements from Mathis' subordinates before her detail, which renders the defendant's fear that Mathis' subordinates would not feel free to speak questionable. Even so, the investigation had not been concluded and defendant articulated that it wished to prevent discord among other employees, besides Mathis' subordinates, including supervisory auditors, auditors who were not on

Mathis' team, and administrative staff. DEX 28, Cochrane Dep. at 26–28.

**46.** Although Mathis says that Barber and Cramer "had an axe to grind with" her, even she admits that the "axe" was related to their desire not to work. Plaintiff's opposition to Defendant's Motion for Summary Judgment at 30. Therefore, there is no evidence of discriminatory motivation on their part.

**47.** To the extent that Mathis has claimed that the disciplinary hearing was discriminatory because she was not permitted to speak to employees, the only evidence Mathis provided to support her claim was Pastro's deposition testimony that he had never seen such a directive and that in his opinion, Mathis should have been able to speak with whomever she chose, subject to agency procedure. However, no evidence in the record shows what the agency regulations were in this

The simple truth established by the record is that Mathis was abusive of her subordinates at the Reston Branch Office, and she was rude to DCAA's clientele. The record admits of no other reasonable conclusions. Mathis' employer would have been warranted in terminating her employment. The far less severe sanction is no basis for a discrimination claim. Hence, for the above mentioned reasons, defendant is entitled to summary judgment on Mathis' discriminatory treatment claim.[48]

## D. Hostile Work Environment—Reston Branch and Capital Branch Offices

Finally, Mathis seeks to cobble together claims that she was subjected to a hostile work environment at the Capital Branch Office and at the Reston Branch Office. Her claim as to the environment at the Capital Branch is made for the following reasons: (1) Hay required Mathis to use the Capital Branch Office as her base of operations; (2) Hay issued memoranda criticizing Mathis' work performance; (3) Hay issued Mathis sub-par evaluations; (4) Hay denied Mathis credit for overtime worked; (5) Hay forced Mathis to carry a heavier workload than others; and (6) Hay made sexist comments to her and others. A hostile work environment existed at the Reston Branch, Mathis claims, because her five day suspension was based upon pretextual reasons and because she was denied the same right as white or male employees to obtain witnesses in preparing her defense to the suspension charge.

To establish a hostile work environment claim of sexual or racial harassment, Mathis must prove that "(1) the subject conduct was unwelcome; (2) it was based on [her sex or race]; (3) it was sufficiently severe or pervasive to alter the [ ] conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d at 753 n. 4 (citing *Spicer v. Commonwealth of Virginia Department of Corrections*, 66 F.3d 705 (4th Cir.1995)) (en banc) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)).

Mathis has not proved her prima facie case of hostile work environment. First, although Mathis has proffered evidence which might permit an inference that the environment in which she worked was hostile and unwelcome, she failed to show that the hostility was connected, even remotely, to her gender or race. The record is devoid of evidence that the unwelcome actions of Hay, of which Mathis complains, were based on *race*. And, no shred of evidence has been presented that Pastro or Cochrane exhibited any gender or race-based animus or that their treatment of Mathis would not have occurred but for her race or gender. For these reasons, summary judgment is granted in favor of defendant respecting: (1) Mathis' racial hostile environment claim based on Hay's behavior; and (2)

regard or whether this type of action was enforced only against blacks and females. The only other evidence in the record is contained in Weikel's decision of proposed suspension, in which he found that it was not unreasonable to have instructed Mathis not to contact those who made statements against her. In any event, Mathis was permitted to solicit statements of support, which she did. DEX 23 at 4. Therefore, Mathis' claim in this regard must fail.

**48.** Mathis alternatively claims that she was detailed to the non-supervisory position and suspended in retaliation for filing complaints with the EEO. The only evidence to support Mathis' claim is temporal proximity. Mathis commenced her second EEO complaint on February 27, 1995 when she contacted an EEO counselor and began an informal complaint process. Cochrane learned of Mathis' original EEO filing respecting Hay's conduct some time in February

1995, and Pastro learned about Mathis' EEO complaint on or about the week of March 10, 1995. Mathis was informed of her detail on or about March 26, 1995 and of her proposed suspension on June 9, 1995. For the reasons discussed above, temporal proximity, in the absence of other evidence, is insufficient to show a causal connection between the aggrieved conduct and the protected activity. Consequently, Mathis has not shown her prima facie case. Assuming, however, that Mathis made a prima facie case of retaliation, the legitimate reasons which defendant asserted to support the suspension and detail of Mathis, as explained above in connection with Mathis' disparate treatment claim, also rebut Mathis' prima facie case of retaliation. Again, Mathis has failed to show that these legitimate non-discriminatory explanations are pretextual. Therefore, Mathis' retaliation claim fails.

Mathis' racial and sexual hostile environment claims respecting Pastro and Cochrane's behavior. The only claim meriting further discussion is Mathis' sexual harassment hostile environment claim, based on Hay's actions.

In that regard, the only alleged gender-based hostilities that Hay displayed to Mathis were his comments to "keep [her] skirt on," "stop [her] bitching," and general remarks about the manner in which Mathis styled her hair or dressed. Even if trivial comments, such as those, could be considered offensive, which they cannot, the remarks do not create an abusive environment because "an isolated ... remark, even though offensive and entirely inappropriate, does not establish an abusive working environment." *Williams v. Prince Georges County Hospital Center,* 932 F.Supp. 687, 689. (D.Md.1996), *aff'd* 103 F.3d 122 (4th Cir.1996); *see also Pagana–Fay v. Washington Suburban Sanitary Commission,* 797 F.Supp. 462, 468 (1992) ("mere utterance of an epithet which engenders offensive feelings in a female employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII"), *aff'd,* 64 F.3d 658 (4th Cir.1995).[49]

Of course, "sexual harassment need not take the form of overt sexual advances or suggestions, but may consist of such things as verbal abuse of women if it is sufficiently patterned to comprise a condition and is apparently caused by the sex of the harassed employee." *Delgado v. Lehman,* 665 F.Supp. 460, 468 (E.D.Va.1987) (citing *McKinney v. Dole,* 765 F.2d 1129, 1138 (D.C.Cir.1985)); *accord Hicks v. Gates Rubber Company,* 833 F.2d 1406, 1415 (10th Cir.1987). Even so, Mathis has failed to show a prima facie case, because she did not show that Hay's so-called

hostile treatment of her would not have occurred but for her gender.

Indeed, Mathis failed to show that any similarly situated male engaged in the same behavior as did she but was not subjected to the same treatment by Hay. For example, although Mathis complains that none of the other supervisory auditors were restricted to working within the Capital Branch Office by Hay, Mathis herself admits that no other supervisory auditory spent as much time away from the office as she had. Mathis Dep.; DEX 25 at p. 26 ("I didn't stay there every day like they did, but I was in and out.").[50] In any event, the undisputed record is that Mathis, in fact, was permitted to continue working at the suboffice as she wished. Moreover, although Mathis claimed that Hay treated her differently than he treated the other supervisory auditors, that differential treatment could not be based on gender, because Mathis admitted that Hay was not as hostile to the other supervisory auditors, including Joan Harriston–Smith, a black female.

Respecting Mathis' claim that Hay forced her to carry a heavier workload than other supervisory auditors,[51] the record reflects that Mathis assumed the caseload of a male, Leander Brown. Therefore, the initial work distribution was not based on gender. Moreover, although Mathis claims that Pastro assigned her responsibility for contractors in addition to the ones assigned to Leander Brown, Hay testified that when he came to the Capital Branch, he examined the program plans which revealed that the budgeted work hours were essentially equal amongst the supervisory auditors. Hay Dep. at 23. Nonetheless, Hay asked Mathis for documen-

---

**49.** As previously noted, the only other evidence which would raise an inference that Hay may have been motivated to treat Mathis poorly because of her gender were the comments Hay made to Latrese Brown, a clerk at DCAA. Mathis has not alleged that comments of the same level of offensiveness were made to her. Nor has Mathis claimed that she ever heard Hay make such remarks, that she knew of such comments before instituting this action, or that Brown told her of them before Mathis filed her Complaint. Hence, even if Hay made such remarks to Brown, they could not have contributed to Mathis' perception that a hostile environment existed.

**50.** Mathis then admitted she went to the office about two to three times per week.

**51.** The EEO counselor investigating Mathis' first EEO complaint found that an imbalance in workload existed, based on the total budgeted hours and hours incurred. The number of assigned contractors did not reflect this imbalance. Mathis had the highest number of total budgeted and incurred hours but the lowest number of assigned contractors. DEX 1 at 20.

tation to enable him to reduce her workload. DEX 3 ¶ 5. Mathis, according to Hay, did not provide the necessary documents until May, and even then, did not provide the additional documentation he requested. Hay Dep. at 21–22. Mathis did not rebut Hay's claim (except to say that Hay had not ordered her to his office to discuss the issue as he claimed) but said only that she had provided him with some report which contained the information he needed and did not recall his having asked for further documentation. Mathis Aff. at p. 3, ¶ 5. Hay also provided Mathis with two additional auditors to help with her outstanding tasks. DEX 9 at 2. And, ultimately, several of Mathis' contractors were shifted to other teams and other Branch offices. DEX 1 at 17.

As to Mathis' claim that Hay denied her credit for overtime worked, the undisputed record is that Hay had previously warned Mathis that she would not receive credit unless she first cleared the overtime hours with him. Mathis also admits that she did not clear the denied overtime hours with Hay despite his warning. DEX 25, Mathis Dep. p. 26–30. Moreover, there is no evidence that Hay treated other supervisory auditors different than Mathis in enforcing this regulation. To the contrary, Hay testified in his deposition that no other supervisors worked credit hours, so he did not have occasion to disapprove such hours. Hay Dep. at 37.

Finally, in regard to Mathis' claim that Hay issued memoranda criticizing Mathis' work performance, the undisputed record is that although Hay issued the first memorandum on his own, the remaining memoranda were issued with the approval of the personnel office. DEX 1 at 18; DEX 9. And, there is no record evidence that the DCAA personnel office harbored discriminatory intent.

Therefore, Mathis has not shown that Hay's unwelcome conduct was based on her sex, and her prima facie case of sexual harassment fails.[52]

## CONCLUSION

As explained above, all of the claims raised by Mathis are lacking in merit. As shown by the record respecting her service at the Capital Branch Office, Mathis was a quarrelsome employee who wanted to do things her way, not as she was instructed by her supervisor. An employer confronted with such clearly documented truculent behavior could have taken strong disciplinary measures rather than merely giving her a reduced score in an otherwise acceptable evaluation. Then when Mathis was transferred to the Reston Branch, she exhibited such abusive behavior toward subordinates and the agency's clientele that an employer would have been justified in firing her. Instead, she received a rather lenient punishment as compared to her misconduct.

The record here shows not a fragment of evidence to support a race based discrimination claim. Indeed, it appears that Mathis' race claims depends solely on the fact that her race is different than that of her supervisors.

The gender based discrimination claim was concocted upon two gender neutral remarks twisted out of context and absolutely unconnected to any employment action. Those remarks were bolstered with evidence respecting another employee which were not shown to have been known to Mathis before her action was filed nor to have been related to any employment decision.

For the above-mentioned reasons, defendant's Motion for Summary Judgment is granted and the action is dismissed with prejudice.

The Clerk is directed to send a copy of this Memorandum opinion to all counsel of record.

It is so Ordered.

---

52. Defendant claimed that Mathis failed to demonstrate that the employer knew or should have known of the alleged sexual harassment. However, according to a report filed by the EEO counselor assigned to investigate Mathis' first EEO complaint, in attempting an informal resolution of the complaint, the counselor spoke to Joseph R. DiCroce, Regional Audit Manager and Willard Weikel, Deputy Directory of the Mid–Atlantic Region, among others. Because of the disposition of Mathis' claims, the Court need not address the notice question.